**IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS**

ROBERT J. BOBB and BOBB AUTO GROUP LLC.

            Plaintiffs,

      v.

SWARTZ-RETSON & CO. P.C., (and Indiana
Corporation)
JOHN SCHUTZ,
TERRY SCHUTZ,
NEW HORIZONS WARRANTY CORPORATION
(an Indiana Corporation),
WILLIAM LOGOTHETIS,
ART GEORGIAN,
KRISTEN QUEEN
SHANDA TAYLOR,
SAKELLARIOS PILATOS
JOHN ZEMBILLAS,
MARK GATTON
MARK GRUENHAGEN,
MICHAEL FRESSO (D/B/A "TOWN AND
COUNTRY MOTORS'),
MOTORS,
DAVID BATUSIC,
THOMAS NEWMAN

and

LARRY MILLER

            Defendants.

Civil Action No.

17-CV-7694

TRIAL BY JURY
DEMANDED

<u>**COMPLAINT PURSUANT TO RACKETEER INFLUENCED AND CORRUPT
ORGANIZATIONS ACT AND OTHER CAUSES OF ACTION**</u>

**18 U.S. Code Chapter 96
RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS**

Plaintiffs sue the Defendants, as conspiring individuals operating a criminal enterprise, for violating Plaintiffs' vested property rights and for misappropriating property. The Defendants conducted a corrupt enterprise in violation of the Racketeer Influenced and Corrupt Organization ("RICO") Act. As grounds therefore, Plaintiffs allege as follows:

## I.    PRELIMINARY STATEMENT

Defendants and others formulated and operated multiple lucrative schemes that included defrauding, embezzlement, conversion, self-dealing, submitting fraudulent financial and accounting statements, taking unwarranted proceeds from Bobb Auto Group LLC and Robert J. Bobb (hereinafter collectively "Bobb" or "Bobb Auto") and other patterns of racketeering activity. Bobb purchased the Chrysler, Dodge, Jeep and Ram dealership located in Cedar Lake, Indiana from Defendants John Schutz and Terry Schutz ("the Schutzs") individually and acting as Center Garage, Inc. The Schutzs were paid $300,000.00 by Bobb for covenants not to compete and an additional $200,000.00 for consulting agreements, whereby the Schutzs remained as consultants for Bobb. Beginning on November 1, 2012,

the Schutzs used their trusted fiduciary role as consultants and solicited sophisticated individuals, which comprised the "Enterprise," to assist in self-dealing, theft, and fraud in the operation of Bobb Auto.

The Enterprise's ringleader was Georgian, who solicited Bobb, introduced him to John Schutz and pitched the sale of the car dealership. In his capacity as Consultant, John Schutz advised Bobb on hiring William Logothetis, a Certified Public Accountant as CFO. Art Georgian was named as General Manager. Together, they enlisted Shanda Taylor to serve as the office manager and bookkeeper charged with hiding and obscuring the schemes. Logothetis commissioned friends and accomplices at Swartz-Retson who created fraudulent financial statements and tax returns to mask the criminal activity. Their goal was to take control of Bobb Auto Group, whereby they would steal money from Bobb and drive Bobb's business into the ground. Doing so would enable them to retake control of the dealership, and also devalue the Chrysler brand in the market surrounding Cedar Lake, Indiana.

The Enterprise's patterns of racketeering activity predate their infiltration of Bobb Auto Group. Previously, the Schutzs, Logothetis, Georgian and Taylor collectively induced people to invest in Center Garage, Inc., whereby the investors and creditors were defrauded out of $3.5 million. When the Schutzs sold Center Garage to Bobb Auto Group, they deliberately hid the existence of the debt, putting Bobb in a position of potential liability. Barely a month following the sale to Bobb, Center Garage declared bankruptcy, leaving investors swindled. The Schutzs converted Center Garage's assets into cash through payments and distributions to

themselves. The Schutzs were enriched, Center Garage was left judgment proof, Bobb Auto was compromised and the investors lost their money.

When the Enterprise took control of Bobb Auto, it continually enlisted additional accomplices (named Defendants) to assist in carrying out multiple criminal schemes to the detriment of Bobb. Most notably, the Enterprise incorporated the accounting firm of Swartz-Retson P.C. ("Swartz-Retson"), who served the Enterprise by deliberately covering up the various financial racketeering schemes and hiding them from Bobb.

The Enterprise's schemes fall generally into four categories: the "New Horizons" scheme, the "Floorplan" scheme, the "Conversion" scheme, and the "Accounting" scheme.


**The "New Horizons" Scheme**

Prior to the Enterprise's taking possession of Bobb Auto, John Schutz and Logothetis owned New Horizons Warranty Corporation, a private warranty company. New Horizons was the warranty provider and source of substantial revenue to Center Garage. As part of the operation of a car dealership, it is standard practice that the dealership creates its own warranty company, sells those warranties and then pays approximately 20% of the warranty premium to a secondary insurer, leaving the remainder as cash reserves and profit for the dealership. When the Schutzs owned the dealership prior to selling it to Bobb, they (along with Logothetis) operated New Horizons to provide warranties to its customers. In the Schutzs' role as consultants, they neglected to advise Bobb to

operate his own warranty company, an essential component to profitably in operating a dealership. The Schutzs and Logothetis also neglected to disclose their ownership of New Horizons.

The Enterprise schemed to sell New Horizons warranties to Bobb Auto customers, depriving Bobb of the warranty sales revenue. As part of the scheme, The Enterprise sought to make Bobb Auto indebted to New Horizons in the amount of $130,000.00. New Horizons "loaned" the $130,000.00 to Bobb Auto. To evidence this loan, Georgian signed a promissory note as President of Bobb Auto in favor of New Horizons. Further, Terry Schutz and Logothetis signed a "Dealer Agreement" on behalf of New Horizons and Georgian signed off on the Agreement for Bobb Auto. Shanda Taylor served as witness attesting to all the signatures. In exchange for the "loan," the Agreement required Bobb to pay principal and interest and gave New Horizons the exclusive right to sell warranties at Bobb Auto. No less than 447 New Horizon warranties were sold to Bobb Auto Group Customers. The Schutzs and Logothetis got rich and defrauded Bobb at the same time. They simultaneously acted as fiduciaries of Bobb while working for their personal enrichment and at the expense and peril of Bobb. Bobb was never made aware that the owners of New Horizons were John Schutz and Logothetis. Bobb was never aware of any "loan" from New Horizons. Bobb was unaware that he should have been receiving the revenue from warranty sales. New Horizons profited from warranty sales, and also from principal and interest loan repayments from Bobb Auto.

**The "Floorplan" scheme**

"Floor planning" is a type of short term loan used by car dealerships to purchase their high cost inventory, whereby the inventory acts as collateral. The dealership pays finance charges on the floor plan, which is factored into the purchase price of the cars and creates an incentive for dealers to turn around vehicles as quickly as possible. As part of the Floorplan scheme, Logothetis and Georgian orchestrated over-payments for purchase of used cars. Many of these cars were subsequently "stolen," in that they were sold privately or at auction for a loss; the entire proceeds lining the Enterprise's pockets. The cars then "disappeared" from Bobb's floorplan. By overpaying for used cars bought on trade-in, Logothetis and Georgian were able sell other new or used inventory. The sale of inventory created the fiction of profitability, but in reality these sales were a concealing other "under-water" inventory and financial loss. Additionally, the Enterprise was falsely reporting the sale of new cars to Chrysler to receive the corporate dealer incentives. Eventually Ally Financial, the floorplan lender to Bobb, discovered the criminal scheme as part of an audit, which resulted in additional monthly curtailments and an increase in the interest rate Bobb had to pay on inventory.

**The "Conversion" Scheme**

The "conversion" scheme was a mechanism where the conspirators personally enriched themselves through theft of inventory and cash. The Enterprise stole from the dealership with impunity. The Schutzs were tendered multiple checks in excess of $47,000.00 without justification. Georgian used $50,000.00 of

Bobb Auto's money to pay for the down payment on his home residence, and also to make the monthly $4,456.00 payments. Further, Georgian named Bobb Auto as the guarantor of the purchase contract, obligating Bobb Auto to close on the purchase of the $700,000 home. He issued checks in excess of $100,000.00 payable to "cash." He also used the company checking accounts and credit cards in excess of $150,000.00 for personal expenses. Taylor personally issued and signed off on these transactions, and then manipulated the bookkeeping records to hide the graft.

**The "Accounting" Scheme**

The "Accounting" Scheme was the tie that bound all of the other schemes together. To conceal the racketeering from Bobb, the Enterprise needed to conceal and manipulate financial statements. Logothetis enlisted his friend David Batusic, partner at the accounting firm of Swartz-Retson Co. P.C. Swartz-Retson then proceeded to identify glaring line items, then devise plans to formulate and fake financial statements and tax returns to perpetuate the ruse.

The Enterprise's various schemes were part of a large design to bleed Bobb's enterprise while at the same time covering up and masking the financial trail. The schemes were deliberate, coordinated and criminal.

## II. **JURISDICTION AND VENUE**

1. This is a civil action for violations of 18 U.S.C. § 1961 *et seq*. ("Racketeer Influenced and Corrupt Organizations Act" or "RICO"), 18 U.S.C. § 1346

("Honest Services Fraud") and THEFT/CONVERSION under Indiana Statute IC 35-43-4-2 & IC 35-43-4-2.5. RICO addresses the corrupt abuse and misuse – usually covertly – of organizations, entities, businesses, institutions or even governments or government agencies, such that superficially legitimate entities actually operate for criminal purposes irrelevant to the entity's purpose. HONEST SERVICES FRAUD is a component under the Federal mail and wire fraud statute, and is a scheme or artifice to defraud and deprive another of the intangible right of honest services. THEFT/CONVERSION is knowingly or intentionally exerting unauthorized control over property of another person, with intent to deprive the other person of any part of its value or use

2. This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. § 1964 and 18 U.S.C. § 1346.

3. This Court also has subject matter jurisdiction over this action based on diversity of citizenship pursuant to 28 U.S.C. § 1332(a)(2).

4. Venue is proper in this judicial district pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391 because Plaintiff Robert Bobb, Defendant Sakellarios Pilatos and Defendant Michael Fresso are subject to personal jurisdiction because they reside in this judicial district. Additionally, Swartz-Retson is a corporation authorized to transact business in Illinois.

## II.     THE PARTIES

5. Plaintiff Bobb Auto Group LLC is an Indiana Limited Liability Company with its principal place of business at 13007 Wicker Ave, Cedar Lake, IN 46303 and

is engaged in the operation of a Chrysler Dodge Jeep Ram dealership.

6. Robert J. Bobb is an individual whose primary place of residence is the State of Illinois, and is the sole member and manager of Bobb Auto Group LLC.

7. Defendant Swartz-Retson & Co. P.C. is an Indiana Corporation, and a foreign corporation authorized to transaction business in Illinois, with its principal place of business at 235 E 86th Ave, Merrillville, IN 46410 and is engaged in the business of offering accounting services.

8. New Horizons Warranty Corporation is an Indiana Corporation with its principal place of business at 11009 W 133rd Ave, Crown Point, IN 46307 and is engaged in the business of providing warranty insurance for automobiles.

9. Defendant John Schutz is an individual whose primary place of residence is the State of Indiana.

10. Defendant Terry Schutz is an individual whose primary place of residence is the State of Indiana.

11. Defendant William Logothetis is an individual whose primary place of residence is the State of Indiana.

12. Defendant Art Georgian is an individual whose primary place of residence is the State of Indiana.

13. Defendant Shanda Taylor is an individual whose primary place of residence is the State of Tennessee.

14. Defendant Thomas DeCanter is an individual whose primary place of residence is the State of Indiana.

15. Defendant Sakellarios Pilatos is an individual whose primary place of residence is the State of Illinois.

16. Defendant John Zembellias is an individual whose primary place of residence is the State of Indiana.

17. Defendant Mark Gruenhagen is an individual whose primary place of residence is the State of Indiana.

18. Michael Fresso is an individual, doing business as Town and Country Motors, whose primary place of residence is the State of Illinois.

19. Defendant David Batusic is an individual whose primary place of residence is the State of Indiana.

20. Defendant Thomas Newman is an individual whose primary place of residence is the State of Indiana.

21. Defendant Michael Gatton is an individual whose primary place of residence is the State of Indiana.

22. Defendant Larry Miller is an individual whose primary place of residence is the State of Illinois.


## FACTUAL ALLEGATIONS COMMON TO ALL RICO COUNTS

23. The following are the necessary elements that are common to all RICO violations. These include: (a) a culpable person, who (b) conducts (or acquires) an "enterprise" (c) affecting interstate commerce (c) through a "pattern" (d) of "racketeering activity." In addition, a civil RICO plaintiff must show injury "by reason of" the RICO violation.

***Culpable Person***. RICO defines a "person" as an "entity capable of holding a legal or beneficial interest in property."

***Enterprise***. RICO defines an enterprise as "any individual, partnership, corporation, association or other legal entity, and any union or group of individuals associated in fact although not a legal entity." Courts have interpreted the term "enterprise" very broadly.

***Interstate or Foreign Commerce***. The interstate commerce requirement is satisfied if either the activity of the enterprise or the predicate acts of racketeering affect interstate commerce.

***Pattern of Racketeering***. Section 1961(5) defines a "pattern of racketeering" as "at least two acts of racketeering activity . . . the last of which occurred within ten years after the commission of a prior act of racketeering activity." The acts must be related and continuous to form a "pattern of racketeering." "Related" is defined as "acts that have the same or similar purposes, results, participants, victims, methods of commission, or otherwise interrelated by distinguishing characteristics and are not isolated events." Continuity can be shown by alleging a close-ended scheme, consisting of a series of related predicate acts extending over a substantial period of time.

***Racketeering Activity***. Most civil RICO cases are based upon allegations of a racketeering activity. "Racketeering activity" is defined as any number of state and federal offenses which are enumerated in § 1961(1).

***Injury***. To establish standing for a civil RICO claim, four factors must be satisfied: The Plaintiff must be (1) a "person" (2) who sustains injury (3) to his or her "business or property" (4) "by reason of" defendant's violation of § 1962. Injury under § 1962(c) must stem from the predicate acts; injury under § 1962(a) must stem from the investment of racketeering income; injury under § 1962(b) must stem from the acquisition of an interest

on or control over an enterprise; and injury under § 1962(d) generally stems from the overt acts committed in furtherance of the conspiracy.

## COUNT I

### RICO § 1962(c)

24. The allegations of paragraphs 1 through 22 are incorporated herein by reference.

Count I is alleged against the following Defendants (hereinafter "Count I Defendants"):

> Swartz-Retson & Co. P.C.,
> John Schutz,
> Terry Schutz,
> New Horizons Warranty Corporation,
> William Logothetis,
> Art Georgian,
> Kristen Queen
> John Zembillas,
> Sakellarios Pilatos
> Mark Gatton,
> Shanda Taylor,
> Thomas DeCanter,
> Mark Gruenhagen,
> David Batusic,
> Thomas Newman
> Larry Miller

25. Bobb Auto Group LLC, which operates a Chrysler Dodge Jeep Ram dealership, is a business engaged in and whose activities affect interstate commerce. The Count I Defendants were all contracted, employed by or associated with Bobb Auto.

26. Each of the Count I Defendants are capable of holding a legal or beneficial interest in property, and therefore each is a "person" with the meaning of 18 USC Section 1961(3).

27. At all relevant times, the Count I Defendants were associated in fact, and constituted

an "enterprise" as that term is defined in 18 USC Section 1961(4), which enterprise was engaged in, and the activities of which affected, interstate commerce. This enterprise shall be referred to here as the "Enterprise." The Enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the Enterprise.

28. The Enterprise's primary purpose was to exercise and preserve power and control over Bobb Auto Group and Robert J. Bobb for the financial benefit of its members. The Enterprise further purposed to steal money from Bobb, drive the value of Bobb Auto Group down to zero, so that it could be bought back at a discount, and to devalue the Chrysler brand in the local market.

29. For purposes of 18 USC Section 1962(c), and during all relevant times, the Count I Defendants each had authority within the Enterprise, and/or conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through the pattern of racketeering activity described below.

30. The Enterprise conducted its racketeering activity, in part, using the interstate mails and wire communications, including by use of telephones, by electronic transfer of funds, and through the mailing of checks. Moreover, the Enterprise directly impacted the businesses Bobb Auto Group and Chrysler Auto Manufacturer, which are conducted through interstate commerce.

31. In furtherance of a scheme or artifice to defraud as defined in 18 USC Sections 1341, 1343, 1344, 1346, 2313 and 659, and with specific intent to defraud, Count I Defendants knowingly used and caused to be used the mail and wire communications to deprive Bobb Auto Group and Robert J. Bobb of their right to honest services of

their fiduciary employees. Defendants' specific predicate acts of mail and/or wire fraud include at least the following:

## ART GEORGIAN

32. Georgian was part of the Enterprise prior to and during its infiltration of Bobb Auto Group, and continued his role in the Enterprise through March 2016.

33. On November 7, 2012, Georgian issued and signed a fraudulent check from Bobb Auto Group to Center Garage for $37,403.00.

34. On November 13, 2017, Georgian issued and signed a fraudulent check from Bobb Auto Group to Center Garage for $10,500.00.

35. On July 11, 2013, Georgian issued and signed a fraudulent check from Bobb Auto Group to "Cash" for $115,357.00.

36. On or about January 2015, Georgian signed a purchase agreement for his personal residence, using Bobb Auto as the guarantor; thereby obligating Bobb Auto for the $700,000 contract purchase price.

37. Georgian authorized multiple $4,456.00 ACH payments from Bobb Auto Group to Shiv and Shachi Sharma to pay for Georgian's monthly payments on his personal residence, including but not limited to, March 1, 2015, May 8, 2015, September 10, 2015.

38. Georgian and Taylor enticed the purchase of new cars by issuing gross over-payments to customers for their used car trade-ins, as reflected in list of purchased "under-water" cars attached and fully incorporated herein, as Exhibit A. The overpayment for used cars resulted in Bobb suffering damages of no less than $259,467.00.

39. Between February 2013 through March 2016, Georgian used the Bobb Auto Group Diners Club Credit Charges for his personal expenses accumulating a total balance of $141,222.49, and $23,088,00 from the Bobb Auto checking account. An itemized accounting of the unauthorized checking account expenditures is attached, and fully incorporated as Exhibit B .

40. On February 29, 2016, Georgian "sold" himself a 2013 Chrysler 300c for $107.00.

41. On February 29, 2016, the day before Georgian resigned, he issued himself a check for $186,450.00.

42. Georgian issued "demo" vehicles to wholesalers and others not entitled. The mileage and use of the "demos" were never recorded, and the cars continued to be fraudulently reflected as new cars on the floor plan. The false floorplan reports were electronically transmitted monthly to Ally Financial.  Correcting the "demos" on the inventory floor plan resulted in more than $125,000.00 of losses.


**JOHN SCHUTZ**

43. John Schutz was part of the Enterprise prior to and during its infiltration of Bobb Auto Group, and continued his role in the Enterprise through March 2016.

44. On November 7, 2017, John Schutz received and deposited a fraudulent check from Bobb Auto Group to Center Garage for $37,403.00.

45. On November 13, 2017, John Schutz received and deposited a fraudulent check from Bobb Auto Group to Center Garage for $10,500.00.

46. Beginning in November of 2014 through March 2016, Schutz's company "New Horizons" was paid $7,337.10 each month from Bobb Auto Group to pay down the

$130,000.00 note.

47. Between November 2014 and March 2016, Schutz's company "New Horizons" received from Bobb Auto revenue from 447 warranties sold, which created $588,797.07 in revenue for the Enterprise – at the expense of Bobb Auto. John Schutz was a recipient of the New Horizon's distributions, which was breach of John's fiduciary duty whereby he foresaw or reasonably should have foreseen that his actions could cause economic harm to the Plaintiffs, including tarnishing Plaintiffs' reputations by engaging in illegal activity and risk to future opportunities for savings and profit.

**TERRY SCHUTZ**

48. Terry Schutz was part of the Enterprise prior to and during its infiltration of Bobb Auto Group, and continued her role in the Enterprise through March 2016.

49. On October 24, 2014, Terry Schutz signed a memorandum of agreement as Secretary of New Horizons documenting that Bobb Auto Group executed a U.S. Warranty Dealer Agreement, a Promissory Note and a Contract for Extended Warranty, all in favor of New Horizons, which was a breach of Terry's fiduciary duty whereby she foresaw or reasonably should have foreseen that her actions could cause economic harm to the Plaintiffs, including tarnishing Plaintiffs' reputations by engaging in illegal activity and risk to future opportunities for savings and profit.

50. On November 3, 2014, Terry Schutz signed a check for $130,000.00 from New Horizons to Bobb Auto Group, creating financial liability and authorizing New Horizons to divert business and profits from Bobb to New Horizons.

**NEW HORIZONS WARRANTY CORPORATION**

51. New Horizons entered the Enterprise as of October 24, 2014 and continued its role in the Enterprise through March 2016.

52. On November 1, 2014, New Horizons became the beneficiary of a $130,000.00 Promissory Note, obligating Bobb Auto Group to pay principle and interest; as well as obligating that 95% of all warranties sold at Bobb Auto Group be New Horizon warranties, further depriving Bobb Auto Group of its Honest Services of their fiduciary employees.

53. Beginning in November of 2014, and every month for the following eighteen months, New Horizons received payment via bank draft or ACH from Bobb Auto in the amount of $7337.10.

54. From November of 2014 through March 2016, New Horizons received monthly payments via bank draft or ACH from Bobb Auto totaling no less than $111,750 for payment on warranties sold.

## **WILLIAM LOGOTHETIS**

55. William Logothetis was part of the Enterprise prior to and during its infiltration of Bobb Auto Group, and continued his role in the Enterprise through March 2016.

56. On September 22, 2014, Logothetis signed a Dealer Agreement with Bobb Auto, as President of New Horizons, creating financial liability and authorizing New Horizons to divert business and profits from Bobb to New Horizons, which was breach of Logothetis' fiduciary duty whereby he foresaw or reasonably should have foreseen that his actions could cause economic harm to the Plaintiffs, including tarnishing Plaintiffs' reputations by engaging in illegal activity and risk to future

opportunities for savings and profit.

57. On October 24, 2014, Logothetis signed a memorandum of agreement as President of New Horizons documenting that Bobb Auto Group executed a U.S. Warranty Dealer Agreement, a Promissory Note and a Contract for Extended Warranty all in favor of New Horizons.

58. On November 3, 2014, Logothetis signed a check for $130,000.00 from New Horizons to Bobb Auto Group.

59. On a monthly basis, Logothetis prepared and oversaw the fraudulent monthly floor plans reports to Chrysler and Bobb

## SHANDA TAYLOR

60. Shanda Taylor was part of the Enterprise prior to and during its infiltration of Bobb Auto Group, and continued her role in the Enterprise through June 2016.

61. Taylor authorized multiple $4,456.00 ACH payments from Bobb Auto Group to Shiv and Shachi Sharma to pay for Georgian's monthly payments on his personal residence, including but not limited to April 8, 2015, June 3, 2015, July 2, 2015.

62. A total of eighteen $4,456.00 payments were made from Taylor and Georgian to the Sharmas resulting in an $80,208.00 loss for Bobb.

63. Additionally, Taylor issued three checks from the Bobb Auto Group checking account in January 2015 totaling $50,000.00 to Shiv and Shachi Sharma for the down payment on Georgian's personal residence, $10,000.00 on November 11, 2014 to real estate broker, Bert Vickory and $2,795 on May 12, 2015 to Williamson Heating and Air Cooling.

64. On November 1, 2014, Taylor served as witness to attest the signatures of

Logothetis on behalf of New Horizons and Georgian on behalf of Bobb Auto on the Promissory Note, which obligated Bobb Auto Group to pay principle and interest; as well as obligating that 95% of all warranties sold at Bobb Auto Group be New Horizon warranties, further depriving Bobb Auto Group of its Honest Services of their fiduciary employees.

65. Taylor, Logothetis and Georgian falsely reported $200,000.00 of new car sales to Chrysler in order to receive the dealer cash incentives, including but not limited to:

    a.   Sale of 1C4PJMBSXGW105086 on October 19, 2015

    b.   Sale of ZACCJBBT8FPC17750 on November 2, 2015

    c.   Sale of 1C6RR7TT0FS789041 on November 2, 2015

    d.   Sale of 1C3CDFEB4GD538867 on November 2, 2015

    e.   Sale of ZACCJAAH8FPC17741 on November 30, 2015

    f.   Sale of ZACCJAAH6FPC15440 on November 30, 2015

    g.   Sale of 1C3CCCAB6GN107349 on November 30, 2015

    h.   Sale of 1C3CCCAG4GN119155 on December 5, 2015

    i.   Sale of 1C4BJWG1GL118521 on December 17, 2015

thereby conducting racketeering activity, in part, using the interstate mails and wire communications, including by use of telephones, relating to interstate transportation of stolen motor vehicles.

66. As a result of the overpayment for used cars, the excess use of new cars as "demos" and the false reporting of new car sales to Chrysler, Taylor , Georgian and Logothetis were each directly responsible for compiling and transmitting fraudulent monthly

inventory reports to Ally Financial, so that Ally would continue furnishing credit to the Dealership, thereby conducting racketeering activity, in part, using the interstate mails and wire communications, including by use of telephones, and also relating to financial institution fraud.

67. Once Ally uncovered the fraud during an audit, Bobb ultimately became liable to Ally for approximately $800,000.00.

68. Following the termination of Logothetis and Georgian in March 2016, Taylor continued to give them access to Bobb Auto internal computer server and financial records. Taylor continued the conspiracy to cover up the Enterprise's schemes

**<u>KRISTEN QUEEN</u>**

69. Kristen Queen, girlfriend of Art Georgian, entered the Enterprise as of September 18, 2013 and continued her role in the Enterprise through January 22, 2015.

70. Queen aided the Enterprise in stealing money from Bobb Auto beginning on September 18, 2013 when she accepted a check from Bobb Auto for $500.00; April 18, 2014 when she had her flight to Dallas paid through Bobb Auto; and January 22, 2015 when she accepted a check from Bobb Auto for $1,120.00, thereby conducting racketeering activity, in part, using electronic transfer of funds, and through the mailing of checks.

71. On February 3, 2014, Queen purchased a 2005 Mustang from Bobb Auto for $5,600.00. The same car was purchased by Bobb Auto on January 9, 2014 for $8,800.00; allowing Queen to take title to the car at a loss to Bobb Auto of $2,711.00. Queen was credited an additional $5,600 for the trade of her 2004 Buick LeSabre, allowing her to take possession of the mustang for $46.25. The LeSabre was sold at

auction for a loss to Bobb Auto of $2,250.00.

72. On June 24, 2014, Queen defrauded Bobb Auto when she purported to "trade-in" a 2012 Chrysler Sebring. The Sebring was never owned by Queen, and was in fact purchased by Bobb Auto on June 21, 2014 in an unrelated transaction. Queen was given a $20,000.00 credit for "trading-in" a car she never owned and had previously been purchased by Bobb Auto, thereby conducted racketeering activity, in part, by using electronic transfer of funds, and through the mailing of checks.

**THOMAS DECANTER**

73. Thomas Decanter, an ex-cop hired by Georgian, entered the Enterprise as of December 2012 and continued his role in the Enterprise through October 3, 2015.

74. Bobb Auto discovered that DeCanter was selling Bobb's used cars over interstate lines "off the books," meaning sold for cash with no receipt or sale of title to a wholesaler in Steger, IL, Michael Fresso, who was doing business as Town and Country Motors, thereby conducting racketeering activity through felonious theft from an interstate shipment.

75. The cars were transported from Indiana to Illinois and sold to Town and Country for cash payment, with no receipt for the sale and no transfer of title. DeCanter never delivered the cash to Bobb.

76. DeCanter provided Fresso and Town and Country with the information required to procure a "duplicate title," so that Town and Country could resell the cars, and DeCanter could avoid transferring title, thereby keeping the transactions "off the books."

77. DeCanter oversaw the theft of a brand new Grand Cherokee from Bobb's inventory,

which was given to Tom McDermott, without any payment to Bobb. DeCanter literally stole the Grand Cherokee and gave it away, thereby conducting racketeering activity through felonious theft from and interstate shipment.

## MICHAEL FRESSO

78. Michael Fresso entered the Enterprise as of December 2012 and continued his role in the Enterprise through October 3, 2015.

79. Fresso assisted the Enterprise's "floorplan scheme" by purchasing multiple used cars from Bobb Auto for cash, without receiving receipt or title from Bobb, to keep the transactions "off the books," thereby conducting racketeering activity through felonious theft from an interstate shipment.

80. Fresso then procured a "duplicate titles," so that he could resell the cars, and aid the Enterprise in concealing stolen inventory.

## MARK GRUENHAGEN

81. Mark Gruenhagen entered the Enterprise as of December 2013 and continued his role in the Enterprise through March 2016.

82. In an effort to conceal various lawsuits filed by customers of Bobb Auto who were victims of the Enterprise's fraud, The Enterprise retained attorney Gruenhagen to represent the dealership and hide the litigation from Robert J. Bobb.

83. In exchange for services, the Enterprise stole a car from Bobb Auto's inventory, and gave it to Gruenhagen. Gruenhagen did not make payments for the car or pay for mechanical service regularly performed on the car.

84. Bobb Auto Group confronted Gruenhagen and asked to see a retainer agreement with Bobb for his services. Gruenhagen provided a compensation agreement purportedly signed by Georgian (on behalf of Bobb) and Gruenhagen, in front of an Indiana Notary Public on January 1, 2016. The compensation agreement was a fraud. Gruenhagen was in Hawaii on January 1, 2016.

85. Bobb never learned of any of the lawsuits until after Georgian and Logothetis were fired.

86. Combined attorney's fees and settlement of pending lawsuits resulted in damages of $69,140.14.

## SWARTZ-RETSON & CO. P.C

87. Swartz-Retson entered the Enterprise as of, 2014 and continued its role in the Enterprise through 2016.

88. The 2014 return, prepared by Swartz-Retson, had material inconsistencies in the Retained Earnings account, including:

   a. Schedule L, Line 24 shows retained earnings at the beginning of 2015 of $973,913 while Schedule M2 shows the retained earnings balance at the beginning of the year as ZERO.

   b. Schedule L, Line 24 at year-end shows $59,242 at the same time Schedule M2 shows NEGATIVE $344,319.

   c. Schedule M2 states distributions were ZERO for 2015, yet Form 1120S, Page 3, Schedule K shows 2015 annual distributions of $490,868.

   d. Additionally, the 2014 return Line 24 "Retained Earnings" end of year

amount of $973,913.00 does not agree to Schedule M-2 "Analysis of Accumulated Adjustments Account", which shows a balance of <u>ZERO!</u> A further subsidiary statement #6 attempts to provide clarification, but contains a further inconsistency. Statement #6 states "distributions $665,397" yet Schedule M-2 states "distribution $463,395". Swartz calculated the difference of $202,002 with no explanation why.

89. Swartz-Retson's fraudulent 2014 tax return was electronically submitted to the IRS, thereby conducting racketeering activity by using the interstate mails and wire communications, including by use of telephones.

90. The 2015 financial statement, tax return and schedules prepared by Swartz-Retson contains such egregious accounting schemes that no reputable CPA would let stand, including:

    e. On page four of the 2015 return, Schedule L, Balance Sheet, Line 13a Intangible Assets declined by $330,000.00. Accumulated Amortization Line 13b declined by $204.495, a direct reduction of assets is an impermissible method of accounting information presentation and violates the accounting principle of historical cost.

    f. The net change in fixed assets on the 2015 balance sheet does not agree to the changes reported on Form 4562 and 4797. The balance sheet shows a net increase of $289,580.00. However, Form 4562 states an increase of $292,880 and Form 4797 shows disposed assets with cost of $12,940.00, for a total net increase of $279,940, leaving an unreconciled difference of $9,640.00.

    g. The 2015 Subchapter S return was amended and has as an attachment

explaining that the return is being amended "to report additional deductions of $400,000 for the write-down of new and used car inventories."

h. The 2015 amended returns claim a "write-down of new and used car inventories," but the 12/31/15 inventory amount on the amended return did not change from the original return's 12/31/15 inventory.

i. Swartz-Retson "plugged in" $250,000 to "other cost" on the Cost of Goods Sold section. To reach the $400,000 increase in cost, Swartz-Retson inflated "miscellaneous expense" by $150,000. An increase in miscellaneous expense, combined with an increase in cost of sales allegedly caused by an over-valuation of ending inventory (but no corresponding reduction in ending inventory) is illegal from a tax reporting position and served to impart knowledge on Swartz-Retson that it was covering up fraud.

j. Further analysis of the amended return demonstrates the balance sheet was also modified. With a "write-down" of inventory value, there would be a reduction in the inventory asset. Instead there is no change in assets, but changes in a liability balance and Retained Earnings. Current liabilities increased by $400,000 for "Accrued Miscellaneous" Without a corresponding vendor obligation of an additional $400,000, Swartz-Retson created a deduction from air.

k. The asset portion of the 2015 tax return balance sheet remained at $8,504,859, therefore the liabilities and equity section total had to agree to the asset section total of the same amount $8,504,859 (hence it would

balance). Swartz-Retson increased current liabilities by $400,000, so owner's equity (Retained Earnings), had to be decreased by $400,000. They accomplished that by increasing the "Net Income Per Books" by an additional loss of $400,000. This "accomplishment" was also created from air and clear evidence that Swartz-Retson was intimately aware of the fraud.

l.   That gross sales increased in 2015 by $6.15 million, but gross profit increased by only $83,198 required more analysis and communication to the shareholders.

m.   Despite gross sales increasing in 2015 by $6.15 million, cash reserves decreased from $914,21.00 to an OVERDRAFT of $91,889.00; and decrease of $1,006,720.00.

n.   Swartz-Retson reported a 77% increase in accounts receivables; money not yet collected by the business, intangible assets decrease of $330,000.00 and long-term loans decrease of $300,073.00

o.   Swartz-Retson overlooked more than $2,000,000.00 in unsubstantiated changes though the use of "plugging," which is the use of false numbers in financial ledgers that force balances, and effectively masks accounting errors and control deficiencies. Plugging makes analysis of the results of operations and financial position unreliable. The 2015 tax return, signed by Newman, epitomizes "plugging" at its zenith.

p.   The balance sheets Swartz-Retson used to file the 2015 return included such obvious frauds, including reflecting a Dodge caravan with an inventory value

of $67.80, and a Ram Pickup with a listed value of $29.05.

91. Swartz-Retson's fraudulent 2015 tax return was electronically submitted to the IRS, thereby conducting racketeering activity by using the interstate mails and wire communications, including by use of telephones.

92. Swartz-Retson overlooked more than $2,000,000.00 in unsubstantiated changes.

93. Swartz-Retson Co. P.C. acted with scienter based on their failure to adequately check the audit client with such indifference to the truth as to have been reckless.

## DAVID BATUSIC

94. David Batusic, a partner at Swartz-Retson and friend of Logothetis entered the Enterprise as of 2014 and continued his role in the Enterprise through March 2016.

95. Batusic personally prepared and transmitted the fraudulent Bobb Auto Group 2014 tax returns, which had numerous material inconsistencies, as described in Paragraph 84.

96. Batusic also falsified Bobb Auto Group financial statements and provided the false statements to the Enterprise to hide the financial graft, thereby conducting racketeering activity by using the interstate mails and wire communications, including by use of telephones.


## THOMAS NEWMAN

97. Thomas Newman, an associate at Swartz-Retson, entered the Enterprise as of 2014 and continued his role in the Enterprise through March 2016.

98. Newman personally prepared and transmitted the fraudulent Bobb Auto Group 2015 tax returns, which had numerous material inconsistencies, as described in Paragraph

86.

99. Newman falsified Bobb Auto Group financial statements and provided the false statements to the Enterprise to hide the financial graft, thereby conducting racketeering activity by using the interstate mails and wire communications, including by use of telephones.

## SAKELLARIOS PILATOS

100.     Sakellarios Pilatos, an associate and friend of Art Georgian, entered the Enterprise on or about November 7, 2013, and continued his role in the Enterprise through March 2016.

101.     On February 4, 2014, Pilatos received and then deposited a check from Bobb Auto for $500.00 under the fictitious guise of a pay advance. The "advance" had no withholdings, and was in fact a theft of Bobb Auto funds.

102.     On May 30, 2014, Pilatos received and then deposited a check from Bobb Auto for $2,300.00 under the fictitious guise of a pay advance. The "advance" had no withholdings, and was in fact a theft of Bobb Auto funds.

103.     On September 8, 2014, Pilatos received and then deposited a check from Bobb Auto for $350 under the fictitious guise of a pay advance. The "advance" had no withholdings, and was in fact a theft of Bobb Auto funds.

104.     On September 15, 2014, Pilatos received and then deposited a check from Bobb Auto for $350 under the fictitious guise of a pay advance. The "advance" had no withholdings, and was in fact a theft of Bobb Auto funds.

105.     On September 22, 2014, Pilatos received and then deposited a check from

Bobb Auto for $350 under the fictitious guise of a pay advance. The "advance" had

no withholdings, and was in fact a theft of Bobb Auto funds.

106.        Beginning on April 7, 2014, Pilatos received and deposited each and

every week until his termination, a $400 check. This further act of money laundering

was fraudulent documented as a training expense and paid to Pilatos' Company.

107.        On September 1, 2015, Georgian, using the Bobb Auto internet servers,

delivered to Pilatos an "Employment Agreement," which purported to bind Bobb

Auto to employing Pilatos, and limiting Bobb Auto's ability to terminate for cause.

This fraudulent agreement was designed to protect Georgian's co-conspirators from

the ensuing discover of fraud, and placed Bobb Auto in a position of liability

## JOHN ZEMBILLAS

108.        John Zembillias, an associate and friend of Art Georgian, entered the

Enterprise on or about March 11, 2013, and continued his role in the Enterprise

through March 2016.

109.        On September 8, 2014, Zembillas received and then deposited a check

from Bobb Auto to Sakellarios Pilatos for $350. The check was signed was endorsed

by Zembillias under the fictitious guise of a pay advance. The "advance" had no

withholdings, and was in fact a theft of Bobb Auto funds.

110.        On September 1, 2015, Georgian, using the Bobb Auto internet servers,

delivered to Zembillas an "Employment Agreement," which purported to bind Bobb

Auto to employing Zembillias, and limiting Bobb Auto's ability to terminate for

cause. This fraudulent agreement was designed to protect Georgian's co-conspirators

from the ensuing discover of fraud, and placed Bobb Auto in a position of liability

## MARK GATTON

111.     Mark Gatton, an associate and friend of Art Georgian, entered the Enterprise on or about April 1, 2014, and continued his role in the Enterprise through March 2016.

112.     Beginning in October 2014, Gatton would receive and deposit checks from Bobb Auto Group without any withholdings, as a means of laundering money and evasion of taxes.

113.     On September 1, 2015, Georgian, using the Bobb Auto internet servers, delivered to Gatton an "Employment Agreement," which purported to bind Bobb Auto to employing Gatton, and limiting Bobb Auto's ability to terminate for cause. This fraudulent agreement was designed to protect Georgian's co-conspirators from the ensuing discover of fraud, and placed Bobb Auto in a position of liability.

## LARRY MILLER

114.     Larry Miller, entered the Enterprise in July 2013.

115.     Georgian conspired with Miller to assist in "laundering" the theft from Bobb Auto. Stolen money was made to appear as if it was being expended for legitimate purposes.

116.     On July 11, 2013, Georgian issued and signed a fraudulent check from Bobb Auto Group to "Cash" for $115,357.00.

117.     The "cash" was converted into a bank draft made out to Georgian's

friend, Larry Miller, who then cashed the draft and took possession of Bobb Auto's money for his own personal use, thereby conducted racketeering activity, in part, using electronic transfer of funds, and through the mailing of checks.

118. Miller represented as if he was acting on behalf of another Chrysler dealership, so that payment to him appeared to be in the normal course of business. Once he deposited Bobb Auto's money into his own bank account, he returned a portion of the money back to Georgian

## ALL COUNT I DEFENDANTS

119. The predicate acts described above were related to one another as part of a common scheme of plan.

120. Such unlawful conduct constituted a continuous pattern of racketeering activity beginning in or around November 2012, through sometime in or around March 2016.

121. As described above, Count I Defendants, in violation of 18 USC Section 1962(d), did agree and conspire between and/or among themselves to violate 18 USC Section 1962(c) for the purpose of achieving and profiting from the racketeering activities described above relating to the above predicate acts. In furtherance of the agreement, each of the Count I Defendants … knowingly and intentionally agreed and conspired to commit at least two of the predicate acts set forth above and they did so with the knowledge and intent that such acts were in furtherance of the foregoing pattern of racketeering.

122. As a direct and proximate cause of the described racketeering activities and violations of 18 USC Section 1962(c), and the described conspiracy in violation of 18

USC Section 1962(d), the Plaintiff's auto business and property have been injured in their business and property.

123.   The Count I Defendants' racketeering activities directly resulted and proximately caused the Plaintiffs to incurred losses of $2.0 million dollars and compelled Plaintiffs to make a capital contribution to Bobb Auto Group of over $2.0 Million dollars to keep Bobb Auto Group solvent.  These injuries were foreseeable consequences of the Count I Defendants racketeering activities and violations of 18 USC Section 1962(c), and their conspiracy in furtherance of those racketeering violations, in violation of 18 USC Section 1962(d).

WHEREFORE, Plaintiffs request that this Court enter judgment against the Count I Defendants as follows:

      a)  Award Plaintiffs all costs of litigation, including reasonable attorneys' fees and expert fees and expenses;

      b)  Award Plaintiffs a judgment against Defendants jointly and severally for actual compensatory damages and treble damages;

      c)  Grant such other and further relief as this Honorable Court deems just and proper.

## COUNT II
## RICO § 1962(a)

124.        The allegations of paragraphs one through 123 are incorporated herein by

reference.

125.       Count II is pled against Defendants John Schutz, Terry Schutz, William Logothetis and The New Horizons Warranty Company. (the "Count II Defendants").

126.       Bobb Auto Group LLC, which operates a Chrysler Dodge Jeep Ram dealership, is a business engaged in and whose activities affect interstate commerce. The Count II Defendants were all contracted, employed by or associated with Bobb Auto.

127.       Each of the Count II Defendants are capable of holding a legal or beneficial interest in property, and therefore each is a "person" with the meaning of 18 USC Section 1961(3).

128.       At all relevant times, the Count II Defendants were associated in fact, and constituted an "enterprise" as that term is defined in 18 USC Section 1961(4), which enterprise was engaged in, and the activities of which affected, interstate commerce. This enterprise shall be referred to here as the "Enterprise." The Enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

129.       The Enterprise's primary purpose was to exercise and preserve power and control over Bobb Auto Group and Robert J. Bobb for the financial benefit of its members. The Enterprise further purposed to steal money from Bobb, drive the value of Bobb Auto Group down to zero, so that it could be bought back at a discount, and to devalue the Chrysler brand in the local market.

130.       For purposes of 18 USC Section 1962(a), and during all relevant times, the Count II Defendants each had authority within the Enterprise, and/or conducted

or participated, directly or indirectly, in the conduct of the Enterprise's affairs through the pattern of racketeering activity described below.

131.     The Enterprise conducted its racketeering activity, in part, using the interstate mails and wire communications, including by use of telephones, by electronic transfer of funds, and through the mailing of checks. Moreover, the Enterprise directly impacted Bobb Auto Group and Chrysler Auto Manufacturer, which are conducted through interstatet commerce.

132.     In furtherance of a scheme or artifice to defraud as defined in 18 USC Sections 1341, 1343, 1344, 1346, 2313 and 659, and with specific intent to defraud, Count II Defendants knowingly used and caused to be used the mails and wire communications to deprive Bobb Auto Group and Robert J. Bobb of their right to honest services of their fiduciary employees. Defendants' specific predicate acts of mail and/or wire fraud include at least the following:

133.     The Count II Defendants used and invested income that was derived from a pattern of racketeering activity in an interstate enterprise. Specifically:

   a. As part of the operation of a car dealership, it is standard practice that the dealership creates its own warranty company, sells those warranties and then pays approximately 20% of the warranty premium to a secondary insurer, leaving the remainder as cash reserves and profit for the dealership.

   b. Insurance companies must hold a portion of their assets as either cash or marketable investments. Statutory reserves are the amount of liquid assets that firms must hold in order to remain

solvent and attain partial protection against a substantial investment loss, and holding reserves reduces the risk of insurance.

c. The revenue generated from the New Horizons scheme required The Schutz, Logothetis and New Horizon to place the proceeds in marketable investments with stable returns.

d. Between November 2014 and March 2016, no less than seventeen monthly payments were transferred from Bobb Auto to New Horizon for distribution and investment

e. After investment of the revenue, New Horizons was enriched no less than $588,797.07.

134. The predicate acts described above were related to one another as part of a common scheme of plan.

135. Such unlawful conduct constituted a continuous pattern of racketeering activity beginning in or around November 2014, through sometime in or around March 2016.

136. As described above, Count II Defendants, in violation of 18 USC Section 1962(d), did agree and conspire between and/or among themselves to violate 18 USC Section 1962(a) for the purpose of achieving and profiting from the racketeering activities described above relating to the above predicate acts. In furtherance of the agreement, each of the Count II Defendants … knowingly and intentionally agreed and conspired to commit at least two of the predicate acts set forth above and they did so with the knowledge and intent that such acts were in furtherance of the foregoing pattern of racketeering.

137. As a direct and proximate cause of the described racketeering activities and violations of 18 USC Section 1962(a), and the described conspiracy in violation of 18 USC Section 1962(d), the Plaintiff's auto business and property have been injured in their business and property. The Count II Defendants' racketeering activities directly resulted and proximately caused the Plaintiffs to incurred losses of $2.0 million dollars and compelled Plaintiffs to make a capital contribution to Bobb Auto Group of over $2.0 Million dollars to keep Bobb Auto Group solvent. These injuries were foreseeable consequences of the Count II Defendants' racketeering activities and violations of 18 USC Section 1962(a), and their conspiracy in furtherance of those racketeering violations, in violation of 18 USC Section 1962(d).

WHEREFORE, Plaintiffs request that this Court enter judgment against the Count II Defendants as follows:

a) Award Plaintiffs all costs of litigation, including reasonable attorneys' fees and expert fees and expenses;

b) Award Plaintiffs a judgment against Defendants jointly and severally for actual compensatory damages and treble damages;

c) Grant such other and further relief as this Honorable Court deems just and proper.

## COUNT III

### RICO § 1962(b)

138. The allegations of paragraphs one through 123 are incorporated herein

by reference.

139. Count III is pled against Defendants John Schutz, Terry Schutz, William Logothetis and New Horizons Warranty Company (the "Count III Defendants").

140. Bobb Auto Group LLC, which operates a Chrysler Dodge Jeep Ram dealership, is a business engaged in and whose activities affect interstate commerce. The Count III Defendants were all contracted, employed by or associated with Bobb Auto.

141. Each of the Count III Defendants are capable of holding a legal or beneficial interest in property, and therefore each is a "person" with the meaning of 18 USC Section 1961(3).

142. At all relevant times, the Count III Defendants were associated in fact, and constituted an "enterprise" as that term is defined in 18 USC Section 1961(4), which enterprise was engaged in, and the activities of which affected, interstate commerce. This enterprise shall be referred to here as the "Enterprise." The Enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

143. The Enterprise's primary purpose was to exercise and preserve power and control over Bobb Auto Group and Robert J. Bobb for the financial benefit of its members. The Enterprise further purposed to steal money from Bobb, drive the value of Bobb Auto Group down to zero, so that it could be bought back at a discount, and to devalue the Chrysler brand in the local market.

144. For purposes of 18 USC Section 1962(b), and during all relevant times, the Count III Defendants each had authority within the Enterprise, and/or conducted

or participated, directly or indirectly, in the conduct of the Enterprise's affairs through the pattern of racketeering activity described below.

145.      The Enterprise conducted its racketeering activity, in part, using the interstate mails and wire communications, including by use of telephones, by electronic transfer of funds, and through the mailing of checks. Moreover, the Enterprise directly impacted Bobb Auto Group and Chrysler Auto Manufacturer, which are conducted through interstate commerce.

146.      In furtherance of a scheme or artifice to defraud as defined in 18 USC Sections 1341, 1343, 1344, 1346, 2313 and 659, and with specific intent to defraud, Count III Defendants knowingly used and caused to be used the mails and wire communications to deprive Bobb Auto Group and Robert J. Bobb of their right to honest services of their fiduciary employees. Count III Defendants' specific predicate acts of mail and/or wire fraud include at least the following:

147.      The Count III Defendants acquired and maintained interest and control of the enterprise through a pattern of racketeering activity.

148.      Specifically, upon sale of the dealership to Bobb, The Schutzs continued to exercise financial direction and control over the enterprise through fraud and as fiduciaries, with the purposes are reacquiring the dealership.

149.      Further, New Horizons, owned by The Schutzs and Logothetis, deposited $130,000 of their money into the enterprise, under the guise of a loan, to acquire and maintain control over the warranty sales.

150.      The loan to Bobb Auto gave the Enterprise carte blanche to sell no less than 447 New Horizon warranties to Bobb Auto Group Customers. Bobb became

indebted to New Horizons in the amount of $130,000.00 and the Enterprise generated $588,797.07 in revenue through warranty sales.

151.    The predicate acts described above were related to one another as part of a common scheme of plan.

152.    Such unlawful conduct constituted a continuous pattern of racketeering activity beginning in or around November 2012, through sometime in or around March 2016.

153.    As described above, Count III Defendants, in violation of 18 USC Section 1962(d), did agree and conspire between and/or among themselves to violate 18 USC Section 1962(b) for the purpose of achieving and profiting from the racketeering activities described above relating to the above predicate acts.  In furtherance of the agreement, each of the Count III Defendants knowingly and intentionally agreed and conspired to commit at least two of the predicate acts set forth above and they did so with the knowledge and intent that such acts were in furtherance of the foregoing pattern of racketeering.

154.    As a direct and proximate cause of the described racketeering activities and violations of 18 USC Section 1962(b), and the described conspiracy in violation of 18 USC Section 1962(d), the Plaintiff's auto business and property have been injured in their business and property.  The Count III Defendants' racketeering activities directly resulted and proximately caused the Plaintiffs to incurred losses of $2.0 million dollars and compelled Plaintiffs to make a capital contribution to Bobb Auto Group of over $2.0 Million dollars to keep Bobb Auto Group solvent.  These injuries were foreseeable consequences of the Count III Defendants' racketeering activities and violations of 18 USC Section 1962(b), and their conspiracy in furtherance of those

racketeering violations, in violation of 18 USC Section 1962(d).

WHEREFORE, Plaintiffs request that this Court enter judgment against the Count III Defendants as follows:

a) Award Plaintiffs all costs of litigation, including reasonable attorneys' fees and expert fees and expenses;

b) Award Plaintiffs a judgment against Defendants jointly and severally for actual compensatory damages and treble damages;

c) Grant such other and further relief as this Honorable Court deems just and proper.

## COUNT IV

### RICO § 1962(d)

155.    The allegations of paragraphs one through 123 are incorporated herein by reference.

156.    Count IV is pled against Defendants John Schutz, Terry Schutz, William Logothetis, New Horizons Warranty Company, Art Georgian, Shanda Taylor, Thomas DeCanter, David Batusic and Swartz-Retson Co. P.C.  (the "Count IV Defendants".)

157.    Bobb Auto Group LLC, which operates a Chrysler Dodge Jeep Ram dealership, is a business engaged in and whose activities affect interstate commerce. The Count IV Defendants were all contracted, employed by or associated with Bobb

Auto.

158.     Each of the Count IV Defendants are capable of holding a legal or beneficial interest in property, and therefore each is a "person" with the meaning of 18 USC Section 1961(3).

159.     At all relevant times, the Count IV Defendants were associated in fact, and constituted an "enterprise" as that term is defined in 18 USC Section 1961(4), which enterprise was engaged in, and the activities of which affected, interstate commerce.   This enterprise shall be referred to here as the "Enterprise."   The Enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

160.     The Enterprise's primary purpose was to exercise and preserve power and control over Bobb Auto Group and Robert J. Bobb for the financial benefit of its members. The Enterprise further purposed to steal money from Bobb, drive the value of Bobb Auto Group down to zero, so that it could be bought back at a discount, and to devalue the Chrysler brand in the local market.

161.     For purposes of 18 USC Section 1962(d), and during all relevant times, the Count IV Defendants each had authority within the Enterprise, and/or conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through the pattern of racketeering activity described below.

162.     The Enterprise conducted its racketeering activity, in part, using the interstate mails and wire communications, including by use of telephones, by electronic transfer of funds, and through the mailing of checks.   Moreover, the Enterprise directly impacted Bobb Auto Group and Chrysler Auto Manufacturer,

which are conducted through interstate commerce.

163.        In furtherance of a scheme or artifice to defraud as defined in 18 USC Sections 1341, 1343, 1344, 1346, 2313 and 659, and with specific intent to defraud, Count I Defendants knowingly used and caused to be used the mails and wire communications to deprive Bobb Auto Group and Robert J. Bobb of their right to honest services of their fiduciary employees. Count IV Defendants' specific predicate acts of mail and/or wire fraud include at least the following:

164.        As set forth above, the Count IV Defendants agreed and conspired to violate 18U.S.C. § 1962(a) (b) and (c). Specifically:

      a.   Defendants John Schutz, Terry Schutz, Logothetis and New Horizons conspired to invest proceeds from the warranty sales, compounding their cash reserves, so that they could leverage and buy back the Dealership, after they ran it into the group.

      b.   Defendants John Schutz, Terry Schutz, Logothetis, Georgian and Taylor conspired to contractually obligate Bobb Auto and Bobb, into accepting the $130,000.00 loan as a pretext for siphoning interest from Bobb Auto and also to profit and have exclusive control over the lucrative warranty sales.

      c.   Defendants John Schutz, Terry Schutz, Logothetis, New Horizons, Georgian, Taylor, DeCanter, Batusic and Swartz-Retson conspired to deprive Bobb Auto and Bobb of income and assets through siphoning the warranty sales, manipulating

inventory to maintain access to credit, theft, and falsifying financial statements and tax returns.

d.  The Count IV Defendants have intentionally conspired and agreed to directly and indirectly use or invest income that is derived from a pattern of racketeering activity in an interstate enterprise, acquire or maintain interests in the enterprise through a pattern of racketeering activity, and conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity.

165.  The predicate acts described above were related to one another as part of a common scheme of plan.

166.  Such unlawful conduct constituted a continuous pattern of racketeering activity beginning in or around November 2012, through sometime in or around March 2016.

167.  As described above, Count IV Defendants, in violation of 18 USC Section 1962(d), did agree and conspire between and/or among themselves to violate 18 USC Section 1962(a)(b) and (c) for the purpose of achieving and profiting from the racketeering activities described above relating to the above predicate acts. In furtherance of the agreement, each of the Count IV Defendants knowingly and intentionally agreed and conspired to commit at least two of the predicate acts set forth above and they did so with the knowledge and intent that such acts were in furtherance of the foregoing pattern of racketeering.

168.  As a direct and proximate cause of the described racketeering activities and violations of 18 USC Section 1962(a)(b) and (c) and the described conspiracy in

violation of 18 USC Section 1962(d), the Plaintiff's auto business and property have been injured in their business and property. The Count IV Defendants racketeering activities directly resulted and proximately caused the Plaintiffs to incurred losses of $2.0 million dollars and compelled Plaintiffs to make a capital contribution to Bobb Auto Group of over $2.0 Million dollars to keep Bobb Auto Group solvent. These injuries were foreseeable consequences of the Count IV Defendants' racketeering activities and violations of 18 USC Section 1962(a)(b) and (c), and their conspiracy in furtherance of those racketeering violations, in violation of 18 USC Section 1962(d).

WHEREFORE, Plaintiffs request that this Court enter judgment against the Count IV Defendants as follows:

a) Award Plaintiffs all costs of litigation, including reasonable attorneys' fees and expert fees and expenses;

b) Award Plaintiffs a judgment against Defendants jointly and severally for actual compensatory damages and treble damages;

c) Grant such other and further relief as this Honorable Court deems just and proper.

## COUNT V

## HONEST SERVICES FRAUD - 18 U.S.C. § 1346

169.    The allegations of paragraphs one through 123 are incorporated herein by reference.

170.     This count is against Defendants John Schutz, Terry Schutz, William Logothetis, Art Georgian, Shanda Taylor, David Batusic and Swartz-Retson Co. P.C. (the "Count V Defendants").

171.     As set forth above, the Count V Defendants agreed and conspired to violate 18U.S.C. § 1346 through a series of schemes to defraud and deprive the Plaintiffs of the right of honest services. Specifically, the Count V defendants breached their fiduciary duty to Bobb Auto Group.

172.     The "New Horizon," "Floorplan," "Conversion" and "Accounting" schemes described in detail in Count I of this Complaint demonstrate that the Count V Defendants intentionally breached their fiduciary duty and foresaw or reasonably should have foreseen that their actions could cause economic harm to the Plaintiffs, including tarnishing Plaintiffs' reputations by engaging in illegal activity and risk to future opportunities for savings and profit.

173.     The Defendants possessed a fraudulent intent and made misrepresentations to influence the Plaintiff's behavior and business conduct.

174.     As Plaintiffs' corporate accountant, Swartz-Retson, Batusic and Newman failed to disclose material information regarding the fraud being committed by employees of its client, Bobb Auto Group; that information would have reasonably led Bobb to change its business conduct and staff personnel.

175.     As General Manager, Georgian failed to disclose material information regarding The Schutzs' and Logothetis ownership of New Horizon, that information

would have reasonably led Bobb to change it business conduct and staff personnel.

176.        William Logothetis failed to disclose material information as Bobb Auto Group's Chief Financial Officer regarding The Schutzs breach of the non-compete and consultant agreements, and Georgian's embezzlement.

177.        As fiduciaries and consultants to the Plaintiffs, John and Terry Schutz failed to disclose material information regarding Logothetis and their relationships to New Horizons.

178.        As bookkeeper and comptroller to the Plaintiffs, Taylor failed to disclose material information regarding the embezzlement of funds and property by Georgian, John Schutz and DeCanter.

179.    As described above, Count V Defendants, in violation of 18 USC Section 1346, did agree and conspire between and/or among themselves to violate 18 USC Section 1346 for the purpose of further depriving Bobb Auto Group of its Honest Services of their fiduciary employees, and they did so with the knowledge and intent that such acts were in furtherance of the foregoing pattern of racketeering.

180.    As a direct and proximate cause of the described violations of 18 USC Section 1346, the Plaintiff's auto business and property have been injured in their business and property.  The Count V Defendants actions directly resulted and proximately caused the Plaintiffs to incurred losses of $2.0 million dollars and compelled Plaintiffs to make a capital contribution to Bobb Auto Group of over $2.0 Million dollars to keep Bobb Auto Group solvent.  These injuries were foreseeable consequences of the Count V Defendants' violations of 18 USC Section 1346.

WHEREFORE, Plaintiffs request that this Court enter judgment against the Count V Defendants as follows:

a) Award Plaintiffs all costs of litigation, including reasonable attorneys' fees and expert fees and expenses;

b) Award Plaintiffs a judgment against Defendants jointly and severally for actual compensatory damages and treble damages;

c) Grant such other and further relief as this Honorable Court deems just and proper.

## COUNT VI

### THEFT, CONVERSION, AND RECEIVING STOLEN PROPERTY

### (IC 35-43-4-2 & IC 35-43-4-2.5)

181.       The allegations of paragraphs 1 through 123 are incorporated herein by reference.

182.       Count VI is alleged against the following Defendants (hereinafter "Count VI Defendants")

John Schutz,
William Logothetis,
Art Georgian,
Kristen Queen
Shanda Taylor,
Thomas DeCanter,
Sakellarios Pilatos
Larry Miller

183.   A person who knowingly or intentionally exerts unauthorized control over property of another person, with intent to deprive the other person of any part of its value or use, commits theft.

184. A person who knowingly or intentionally exerts unauthorized control over the motor vehicle of another person, with intent to deprive the owners of :1) the vehicle's value or use; or a component part of the vehicle; commits auto theft.

185. Indiana law allows a claim for triple damages when a civil claim is based on facts that satisfy the elements of criminal conversion.

186. Bobb Auto had a right to the following property:

   a. The $115,357.00 check made out to "cash," and transferred by Georgian to Larry Miller

   b. The $141,222.49 that Georgian charged to the Bobb Auto Diners Club credit card.

   c. The $23,088.00 paid from the Bobb Auto checking account for Georgian's personal expenses.

   d. The 2013 Chrysler 300c valued at $21,000.00 that Georgian sold to himself on February 29, 2016 for $107.00.

   e. The new automobile values depreciated by Georgian from unauthorized use as "demos," resulting in $125,000.00 of losses.

   f. The $143,003.00 of Bobb Auto's money paid for the purchase Georgian's home residence

   g. $47,903.00 of Bobb Auto's money paid to John Schutz through Center Garage.

   h. The $588,797.07 in warranty sales revenue.

   i. The $800,000 Bobb had to expend to Ally Financial after being lead to

   j. believe that Logotheits, Georgian and Taylor (as fiduciaries) were submitting correct floorplan reports.

   k. The $1,120 and $500 paid to Kristen Queen via checks from Bobb Auto, and the money paid by Bobb Auto for her flight to Dallas.

   l. The $24,961.00 of Bobb Auto's money Queen and Georgian converted through overpayment of the 2004 Buick LeSabre, the undervaluing of the 2005 Mustang and the fictitious credit given to Queen on June 24, 2014 for a 2012 Chrysler Sebring she didn't own.

   m. The $13,200 of Bobb Auto's money that Pilatos converted and received under the false pretense of "pay advance."

n.  The value of the vehicles DeCanter transported to Illinois and sold to Michael Fresso.

187.  Bobb Auto Group LLC and Robert J. Bobb had an absolute and unconditional right to the immediate possession of the property.

188.  Bobb Auto and Robert J. Bobb has demanded possession from the Defendants.

189.  Count VI Defendants wrongfully and without authorization assumed control, dominion and ownership over the property.

190.  As a direct and proximate cause of the described violations of IC 35-43-4-2 & IC 35-43-4-2.5, the Plaintiff's auto business and property have been injured in their business and property.  The Count VI Defendants actions directly resulted and proximately caused the Plaintiffs to incurred losses of $2.0 million dollars and compelled Plaintiffs to make a capital contribution to Bobb Auto Group of over $2.0 Million dollars to keep Bobb Auto Group solvent.  These injuries were foreseeable consequences of the Count VI Defendants' violations of IC 35-43-4-2 & IC 35-43-4-2.5.

WHEREFORE, Plaintiffs request that this Court enter judgment against the Count VI Defendants as follows:

a)  Award Plaintiffs all costs of litigation, including reasonable attorneys' fees and expert fees and expenses;

b)  Award Plaintiffs a judgment against Defendants jointly and severally for actual compensatory damages and treble damages;

c) Grant such other and further relief as this Honorable Court deems just

and proper.

PLAINTIFFS DEMAND TRIAL BY JURY.

Respectfully Submitted,
Bobb Auto Group LLC and Robert J. Bobb,

/s/ Joel Rabb_____
One of Plaintiff's Attorneys


Joel Rabb – 6305201
Hesik-Prybylo
821 Garfield St.
Oak Park, Illinois 60304
708-383-4175