IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ROBERT J. BOBB and BOBB AUTO GROUP, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| SWARTZ-RETSON P.C., JOHN SCHUTZ, TERRY SCHUTZ, NEW HORIZONS WARRANTY CORP., WILLIAM LOGOTHETIS, ART GEORGION, SHANDA TAYLOR, KRISTEN QUEEN, SAKELLARIOS PILATOS, JOHN ZEMBILLAS, MARK GATTON, MICHAEL FRESSO, DAVID BATUSIC, THOMAS NEWMAN, LARRY MILLER, MARK GRUENHAGEN, and THOMAS DECANTER, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | 17-cv-7694 Judge John Z. Lee |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Robert J. Bobb ("Bobb"), the sole owner and manager of Plaintiff Bobb Auto Group ("Bobb Auto"), filed suit against various individuals and entities, including a group of its former employees, two former consultants, and its former accounting firm, among others. Plaintiffs allege that Defendants conducted a corrupt enterprise in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, and violated other federal and state statutes, by scheming to sell Plaintiffs a car dealership and to defraud and steal from Plaintiffs until the business lost all value. Twelve of the seventeen Defendants move in seven

different motions[1] to dismiss the amended complaint pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6). ECF Nos. 43, 87, 88, 90, 92, 95, 100. For the reasons given below, the Court grants the Defendants' motions and dismisses the amended complaint.

## Factual Background[2]

Plaintiff Robert J. Bobb is the sole member and manager of Plaintiff Bobb Auto Group, LLC. Am. Compl. at 9, ECF No. 10. At some point prior to November 1, 2012,[3] Defendant Art Georgion introduced Bobb to Defendants Terry and John Schutz ("the Schutzes"). *Id.* at 2. The Schutzes owned Center Garage, Inc. ("Center Garage"),[4] a

---

[1] Defendants Swartz-Retson & Co., P.C., David Batusic, and Thomas Newman file a joint motion to dismiss, ECF No. 43, as do John Schutz, Terry Schutz, William Logothetis, and New Horizons Warranty Corporation, ECF No. 95. Defendants Mark Gruenhagen, Thomas DeCanter, Kristen Queen, Art Georgian, and Shanda Taylor each individually submit motions to dismiss (respectively, ECF Nos. 87, 88, 90, 92, 100). Defendants Michael Fresso and Larry Miller have not filed appearances; Defendants Sakellarios Pilatos, John Zembillas, and Mark Gatton each answered the amended complaint and did not move to dismiss. *See* ECF Nos. 84, 85, 86.

[2] The following facts are taken from the amended complaint and are accepted as true on review of the motions to dismiss. *See Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008) (stating that, at the motion-to-dismiss stage, the court "accept[s] as true all well-pleaded facts alleged").

[3] Plaintiffs do not provide dates for many of their factual allegations, but Bobb hired the Schutzes as consultants on November 1, 2012. *See* Am. Compl. at 2–3.

[4] Although Plaintiffs do not explicitly state it, it may be reasonably inferred from the allegations in the amended complaint that Center Garage was the company operating the dealership before the sale. *See* Am. Compl. at 2 (stating that Bobb purchased the dealership from the Schutzes "individually and acting as Center Garage, Inc.,"); *id.* at 3 (explaining that the Schutzes and other Defendants had earlier induced people to invest in Center Garage, then defrauded the investors out of $3.5 million); *id.* ("[W]hen the Schutz[e]s sold Center Garage to Bobb Auto Group, they deliberately hid the existence of the debt.").

Chrysler, Dodge, Jeep and Ram dealership in Cedar Lake, Indiana. *Id.* Georgion pitched the sale of the dealership to Bobb, who purchased it from the Schutzes. *Id.*

As part of the sale, Bobb paid the Schutzes $300,000 for covenants not to compete, and $200,000 for agreements providing that the Schutzes would remain as consultants for Bobb Auto. *Id.* As a consultant, John Schutz advised Bobb to hire Defendant William Logothetis, a certified public accountant, as Bobb Auto's Chief Financial Officer. *Id.* at 3. Georgion was named General Manager. *Id.* John Schutz and Georgion then hired Defendant Shanda Taylor as Office Manager and Bookkeeper. *Id.*

This was not the first time the Schutzes, Logothetis, Georgion, and Taylor collaborated. They had collectively induced others to invest in Center Garage. *Id.* By the time Bobb purchased the dealership, Center Garage was in debt, a fact that the Schutzes hid from him. *Id.* A month after the sale, Center Garage declared bankruptcy, resulting in its creditors and investors losing $3.5 million. *Id.* At some point,[5] the Schutzes "converted" Center Garage's assets into cash through payments and distributions to themselves. *Id.* at 3–4.

According to Plaintiffs, the Schutzes, Logothetis, Georgion, and Taylor were all part of the "Enterprise," an entity that sought to steal money from and take control of Bobb Auto, ultimately buying back the dealership once Bobb Auto's business was ruined. *Id.* at 3, 13. The Enterprise also aimed to devalue the Chrysler brand in the

---

[5]    It is unclear whether the "conversion" of Center Garage's assets occurred before or after Center Garage declared bankruptcy. *See* Am. Compl. at 3–4.

area. *Id.* While Georgion functioned as the Enterprise's ringleader, every Defendant was a member of this entity.[6] *Id.* at 12–13. Plaintiffs allege that the Enterprise conducted four types of schemes: the "New Horizons Scheme," the "Floorplan Scheme," the "Conversion Scheme," and the "Accounting Scheme." *Id.* at 3.

## I. The New Horizons Scheme

According to Plaintiffs, it is standard practice for a car dealership to operate its own warranty company. *Id.* at 4–5. The dealership would then sell its customers warranties provided by that company, pay approximately 20% of the warranty premiums to a secondary insurer, and keep the remainder. *Id.* at 4. As a consultant, John Schutz neither advised Bobb to operate his own warranty company, nor informed Bobb that, prior to selling the dealership to Bobb, the Schutzes and Logothetis owned a private warranty company, Defendant New Horizons Warranty Company ("New Horizons"), which served as the warranty provider to Center Garage. *Id.* at 4, 5.

---

[6] Plaintiffs ascribe many generalized schemes to the "Enterprise," but in most cases the actions comprising the schemes were clearly taken by specific individuals. *See, e.g.,* Am. Compl. at 5 (describing the Enterprise as "schem[ing] to sell New Horizons warranties to Bobb Auto customers," but attributing each individual action that was part of the scheme to Georgion, the Schutzes, or Logothetis). Most of Plaintiffs' allegations regarding the Enterprise are conclusory rather than factual and therefore are not included in this fact section. *See Doyle v. Camelot Care Ctrs., Inc.,* 305 F.3d 603, 614 (7th Cir. 2002) (Courts must accept as true all well-pleaded facts but "need not accept as true conclusory statements of law or unsupported conclusions of fact." (internal quotation marks and citation omitted)).

Starting in late 2014, approximately two years after Bobb Auto purchased the dealership, Bobb Auto[7] gave New Horizons the exclusive right to sell warranties for its cars. *Id.* at 5. The process had several steps. First, on September 22, 2014, the two companies signed a "Dealer Agreement," with Terry Schutz and Logothetis signing on behalf of New Horizons, and Georgion signing for Bobb Auto. *Id.* at 5, 16, 17. Taylor served as a witness attesting to the signatures on the agreement. *Id.* at 5.

The agreement provided that, in exchange for a $130,000 loan, 95% of the warranties sold by Bobb Auto were to be New Horizons warranties. *Id.* at 17. On October 24, 2014, Logothetis (as New Horizons President) and Terry Schutz (as New Horizons Secretary) signed a memorandum of agreement,[8] documenting that Bobb Auto Group had executed a warranty dealer agreement, promissory note, and contract for extended warranty with New Horizons. *Id.* at 16, 17.

On November 3, 2014, without Bobb's knowledge, New Horizons loaned Bobb Auto $130,000, pursuant to a promissory note signed by Georgion on Bobb Auto's behalf. *Id.* at 5, 16. From November 2014 through March 2016, Bobb Auto paid New Horizons $7,337.10 every month for principal and interest on the note, adding up to

---

[7] It is unclear whether Bobb was aware of the warranty agreement, but Plaintiffs allege that he never knew that New Horizons was owned by Logothetis and the Schutzes or that New Horizons loaned Bobb Auto $130,000. Am. Compl. at 5.

[8] It is unclear if the memorandum of agreement was signed by anyone on behalf of Bobb Auto. *See* Am. Compl. at 16, 17.

$111,750.  *Id.* at 15–17.  During that same period of time, New Horizons received $588,797.07 in revenue from Bobb Auto for 447 warranties.  *Id.* at 16.

## II.    The Floor Plan Scheme

Meanwhile, Logothetis and Georgion were engaging in a scheme in which they "orchestrated" overpayments to customers for used car trade-ins.  *Id.* at 6, 14.  The overpayments, for 61 cars, resulted in a loss to Bobb of approximately $259,467.  *Id.* at 14; *see id.*, Ex. A, Water vs. Avg MMR Avg Blk Bk NADA Avg Trade-Bobb Auto Group-2016-03-09-1004.xls (calculating the total difference between prices paid per trade-in from the National Automobile Dealership Association (NADA)[9] trade-in average for each of those cars, for a sum of $259,467).  The overpayments helped Logothetis and Georgion more easily sell cars and created the impression of profitability.[10]  *Id.*

The cars for which Bobb Auto overpaid were later sold privately or at an auction for a loss.  *Id.*  It is unclear who received the proceeds from the sales of the used cars.  Plaintiffs allege broadly that the proceeds from the private sales of the used cars went to the Enterprise, *see* Am. Compl. at 6, but they imply elsewhere that

---

[9]    Although Plaintiffs do not provide the full name for the acronym "NADA," the Court takes judicial notice that NADA stands for National Automobile Dealership Association.  *See* Fed. R. Civ. P. 201; *About Us*, NADA Guides, available at www.nadaguides.com/ Company-Overview (last accessed 8/20/2018).

[10]    Plaintiffs state that "[b]y overpaying for used cars bought on trade-in, Logothetis and Georgion were able [to] sell other new or used inventory . . . creat[ing] a fiction or profitability." Am. Compl. at 6.  Although Plaintiffs do not further explain, the Court presumes that the overpayments for trade-ins operated as an incentive for customers, who then effectively paid less for the car they purchased from Bobb.

Bobb Auto received funds from at least some private sales. *See id.* at 20–21 (stating that a trade-in for which Bobb Auto paid $5,600 was later "sold at auction for a loss to Bobb Auto of $2,250").[11] At least some of the used cars were sold by Defendant Thomas DeCanter, whom Georgion hired as a Bobb Auto employee in or around December 2012. *Id.* at 21. DeCanter sold Bobb's used cars "off the books" to Defendant Michael Fresso, a wholesaler in Steeger, Illinois, who was doing business as Town and Country Motors. *Id.* The cars were sold for cash, with no receipt or transfer of title, and DeCanter never delivered the cash to Bobb.[12] *Id.*

In addition to Bobb Auto overpaying for trade-ins and possibly losing the value of the trade-ins altogether, Logothetis and Georgion's actions also caused Ally Financial, Bobb Auto's floor plan lender, to increase Bobb Auto's interest rates. *Id.* at 6. Ally Financial was extending credit to Bobb Auto through short-term loans, in which car inventory (known as the "floor plan") acts as collateral for the loan. *Id.* From what the Court can discern, the used cars that Logothetis and Georgion were re-selling off the books were no longer available as collateral for the floor plan lender, but Logothetis, Georgion, and Taylor would send in floor plans that did not reflect that fact. *See id.* at 6, 18, 48. Nor did the floor plans reflect that Georgion was issuing new "demo" vehicles to unauthorized people, such as wholesalers; instead, the demo vehicles continued to be marked as new, unused cars. *Id.* at 15. Ally Financial

---

[11]    This means that Bobb Auto received the proceeds from at least this sale because if not, it would have lost $5,600 upon the car's sale at auction.

[12]    The only other mention of DeCanter in the amended complaint is an allegation that he gave away, for free, a new Grand Cherokee that belonged to Bobb. Am. Compl. at 21–22.

discovered the inaccuracies in the floor plans as part of an audit and raised Bobb Auto's interest rate accordingly. *Id.* at 6. This scheme ultimately caused Bobb Auto to incur $800,000 worth of additional liability to Ally Financial. *Id.* at 20.

## III.   The Conversion Scheme

From shortly after Bobb Auto's purchase of the dealership until March 2016, multiple people received unauthorized payments or benefits from Bobb Auto. Georgion issued many of these payments. For example, Georgion issued and signed two checks from Bobb Auto to Center Garage: for $37,403.00 on November 7, 2012, and for $10,500 on November 13, 2012.[13] *Id.* at 14. Both of those checks, which Plaintiffs describe as "fraudulent," were received and deposited by John Schutz. *Id.* at 15.

Many of the other "fraudulent" checks that Georgion issued were for his own benefit. On July 11, 2013, Georgion issued a check from Bobb Auto to "cash" for $115,357.00. *Id.* at 14, 30. The check was deposited into the bank account of Defendant Larry Miller, a friend of Georgion; Miller then returned a portion of the money back to Georgion. *Id.* at 30–31. The two claimed that the transaction was made for the benefit of another Chrysler dealership in order to make the payment appear normal. *Id.* at 31.

---

[13]   Plaintiffs state that that this check was issued and signed on November 13, 2017. Because Plaintiffs indicate that Georgion was no longer employed by Bobb Auto in 2017, the Court concludes that "2017" is a typo for "2012," the same year as the previous check issued. *See* Am. Compl. at 15.

Furthermore, from November 2013 through March 2016, Georgion used Bobb Auto checking accounts to pay for $23,088 worth of personal expenses, including bills for cell phone service, cable, and utilities. *Id.* at 15, *see also id.*, Ex. B., Art Georgion Bills Paid Through Harris Bank at 1, ECF No. 10-2. And from February 2014 to March 2016, Georgion used Bobb Auto Group credit cards for personal expenses totaling $131,222.49. *Id.* at 7, 15. Taylor signed off on these transactions and manipulated the bookkeeping records to hide them. *Id.* at 7.

Sometime around January 2015, Georgion named Bobb Auto as the guarantor on the purchase contract for a $700,000 house. *Id.* at 14. He also used Bobb Auto funds to pay for $50,000 of the house's down payment, *id.* at 6, 18, and for $80,208 in mortgage payments over eighteen months, *id.* at 14, 18. Taylor authorized these transactions. *Id.* at 18.

On February 29, 2016, the day before his last day at Bobb Auto, Georgion purchased a 2013 Chrysler 300c for $107 and wrote himself a check for $186,450. *Id.* at 15.

Meanwhile, Art Georgion's girlfriend, Defendant Kristen Queen, also received numerous items of value from Bobb Auto. She accepted two checks from Bobb Auto, for $500 and $1,120, on September 18, 2013, and January 22, 2015. *Id.* at 20. On February 3, 2014, she exchanged her 2004 Buick LeSabre for a 2005 Mustang. The Mustang had been purchased by the dealership a month earlier for $8,800; Bobb Auto later sold the Buick LeSabre at auction for $3,350. *Id.* at 20–21. Two months later, on April 18, 2014, Bobb Auto paid for a flight to Dallas for Queen. *Id.* And in June 2014, Queen received a $20,000 credit for a purported trade-in of a 2012 Chrysler

Sebring that she had never owned and that had in fact been purchased by Bobb Auto three days earlier in an unrelated transaction. *Id.* at 21.

Other individuals also received unauthorized payments. Defendant Sakellarios Pilatos was employed at Bobb Auto from some point before February 4, 2014 through March 2016. *See id.* at 28–29. Pilatos received the following fictitious pay advances, none of which had withholdings: February 4, 2014, for $500; May 30, 2014, for $2,300; September 8, 2014, for $350[14]; September 15, 2014, for $350; September 22, 2014, for $350. *Id.* at 28–29. Pilatos's company also received an additional $400 per week, without withholdings, from April 7, 2014 through his termination, documented as a training expense. *Id.* Similarly, from October 2014 to some point before March 2016, Defendant Michael Gatton, a friend of Georgion, received and deposited checks from Bobb Auto that did not have any withholdings.[15] *Id.* at 30.

Finally, Logothetis, Georgion, and Taylor all sought to receive dealer cash incentives by falsely reporting to Chrysler that, from October 19, 2015, through December 17, 2015, nine new cars had been sold for $200,000.[16] *Id.* at 19.

---

[14] The September 8, 2014, check for $350 was endorsed and deposited by Defendant John Zembillas. Am. Compl. at 29.

[15] On September 1, 2015, Pilatos, Gatton, and Defendant John Zembillas each received an "employment agreement" from Georgion, which purported to bind Bobb Auto to employing them and limited its ability to terminate them for cause. Am. Compl. at 29–30.

[16] Plaintiffs do not indicate if the dealer cash incentives were received or who received them. *See* Am. Compl. at 19.

### III. The Accounting Scheme and Legal Defense

At some time in 2014, Logothetis engaged Defendant David Batusic, partner at the accounting firm of Defendant Swartz-Retson Co. P.C. ("Swartz-Retson"), to prepare Bobb Auto's tax returns. *Id.* at 15, 27. Batusic prepared and transmitted Bobb Auto's 2014 tax returns, which had numerous material inconsistencies, particularly as to retained earnings. *Id.* at 23–24, 27. In 2015, Defendant Thomas Newman, an associate at Swartz-Retson, prepared Bobb Auto's 2015 tax returns, which also had numerous material inconsistencies. *Id.* at 24–27. According to Plaintiffs, both Batusic and Newman also formulated "fake financial statements" to "disguise[ ] . . . problematic transactions. *Id.* at 15; *see also id.* at 27, 28.

Starting in December 2013, the Enterprise retained Defendant Mark Gruenhagen, an attorney, to represent Bobb Auto in various lawsuits filed by its customers. *Id.* at 22. Bobb was unaware of the lawsuits or that Gruenhagen had been retained. *Id.* Gruenhagen was paid with a free car from Bobb Auto's inventory, as well as free mechanical services. *Id.* At some point after January 1, 2016, Bobb confronted Gruenhagen and asked to see a retainer agreement. *Id.* at 23. Gruenhagen provided a compensation agreement dated January 1, 2016, signed by Gruenhagen and by Georgion on behalf of Bobb Auto, in front of a notary public.[17] *Id.* Bobb only learned of the lawsuits after Logothetis and Georgion were no longer

---

[17] Plaintiffs allege that Gruenhagen was out of town when the retainer was purportedly signed. Am. Compl. at 23.

working for the dealership; the attorney's fees and settlements cost Bobb Auto almost $70,000.  *Id.*

Logothetis and Georgion stopped working for Bobb Auto in March 2016.[18]  *Id.* at 20.  According to Plaintiffs, all Defendants' involvement in the Enterprise ended March 2016, except for Taylor, who continued to give Logothetis and Georgion access to the dealership's internal computer server and financial records until June 20, 2016. *Id.* at 18.

## **Legal Standard**

To survive a motion to dismiss under Rule 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Additionally, when considering motions to dismiss, the Court accepts "all well-pleaded factual allegations as true and view[s] them in the light most favorable to the plaintiff." *Lavalais v. Vill. of Melrose Park*, 734 F.3d 629, 632 (7th Cir. 2013)  At the same time, "allegations in the form of legal conclusions are insufficient to survive a Rule 12(b)(6) motion." *McReynolds v. Merrill Lynch & Co., Inc.*, 694 F.3d 873, 885 (7th Cir. 2012) (citing *Iqbal*, 556 U.S. at 678).  As such, "[t]hreadbare recitals of the elements of the

---

[18]    At various points in the amended complaint, Plaintiffs indicate that Georgion resigned, Am. Compl. at 15, or that both Georgion and Logothetis were fired, *id.* at 20, 23.

cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

## Analysis

Plaintiffs allege violations of all four RICO subsections and of two Indiana provisions. In Count I, Plaintiffs allege that all Defendants[19] violated § 1962(c), Am. Compl. at 12; in Count II, Plaintiffs allege that the Schutzes, Logothetis, and New Horizons violated § 1962(a), *id.* at 32–33; in Count III, Plaintiffs allege that the Schutzes, Logothetis, and New Horizons violated §§ 1962(b) and (d), *id.* at 36–37; and in Count IV, Plaintiffs allege that the Schutzes, Logothetis, New Horizons, Georgion, Taylor, DeCanter, Batusic, and Swartz-Retson violated § 1962(d), *id.* at 40. Finally, in Count VI,[20] Plaintiffs allege that John Schutz, Logothetis, Georgion, Queen, Taylor, DeCanter, Pilatos, and Miller committed acts of theft, conversion, and receiving stolen property, in violation of Indiana Code §§ 35-43-4-2 and 35-43-4-2.5.

A RICO claim "is a unique cause of action that is concerned with eradicating organized, long-term, habitual criminal activity." *Gamboa v. Velez*, 457 F.3d 703, 705 (7th Cir. 2006). Although RICO "provides a private civil action to recover treble damages for violations of RICO's substantive provisions, the statute was never intended to allow plaintiffs to turn garden-variety state law fraud claims into federal RICO actions." *Jennings v. Auto Meter Prods., Inc.*, 495 F.3d 466, 472 (7th Cir. 2007)

---

[19] Plaintiffs do not bring any claims against Defendant Michael Fresso. Accordingly, the Court *sua sponte* dismisses him from the case.

[20] Plaintiffs have since withdrawn Count V. *See* Pls.' Resp. Opp'n Swartz-Retson Mot. Dismiss at 16, ECF No. 74.

(citing *Midwest Grinding Co., Inc. v. Spitz*, 976 F.2d 1016, 1022 (7th Cir. 1992)) (internal citations omitted); *see also* 18 U.S.C. § 1964.

Defendants argue that Plaintiffs fail to state a RICO claim under any of the RICO § 1962 subsections because, among other things, they do not sufficiently allege the existence of an enterprise. *See, e.g.,* Taylor's Mem. Supp. at 4–9, ECF No. 102; Logothetis, New Horizons, and Schutzes' ("Schutz Defs.'") Mem. Supp. at 12–13, ECF No. 96. Although there are significant substantive differences among the four RICO provisions, the existence of an "enterprise" is fundamental to each provision. *See* 18 U.S.C. §§ 1962(a)–(d). The Court therefore first addresses whether Plaintiffs have properly alleged the existence of an enterprise before turning to the additional requirements specific to each provision.

## I. RICO Claims

### A. Existence of an Enterprise

Under RICO, an "enterprise" is defined broadly to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). An association-in-fact—the type of enterprise that Plaintiffs allege here, *see* Am. Compl. at 12–13—"does not require any structural features beyond 'a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purposes.'" *Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 655 (7th Cir. 2015) (citing *Boyle v. United States*, 556 U.S. 938, 946 (2009)).

Defendants contend that Plaintiffs have not sufficiently alleged an enterprise. According to Defendants, Plaintiffs fail to tie Defendants together into a single entity formed for a common purpose, instead alleging that Defendants engaged in a series of acts for their own individual benefits, rather than for that of the whole. *See* Decanter's Mot. Dismiss at 2–3, ECF No. 88; Queen's Mot. Dismiss at 2–4, ECF No. 90; Schutz Defs.' Mem. Supp. at 12–13, Taylor's Mem. Supp. at 4–9. Defendants contend that, at most, Plaintiffs have alleged "individually opportunistic" theft and embezzlement. Georgion's Mot. Dismiss at 7, ECF No. 92; Taylor's Mem. Supp. at 8–9.

In response, Plaintiffs point to allegations in the amended complaint that Defendants shared the common purpose of stealing money from Plaintiffs and of driving down the value of Bobb Auto so that the dealership could be bought at a discount. *See, e.g.,* Pls.' Resp. Opp'n Decanter's Mot. Dismiss at 3, ECF No. 134; Pls.' Resp. Opp'n Queen's Mot. Dismiss at 4–6, ECF No. 136. Plaintiffs also allege that Defendants sought to devalue the Chrysler brand in the local market. Am. Compl. at 3, 13.

But while Plaintiffs allege that Defendants shared a common purpose of stealing money from Plaintiffs, nowhere do Plaintiffs allege that the money stolen went to some sort of common, enterprise-owned pot. Instead, the money stolen appeared to be solely for each individual's benefit. *See, e.g.,* Am. Compl. at 21–22 (DeCanter sold Bobb Auto's cars off-the-books and never paid Bobb); *id.* at 21 (Queen received $20,000 in credit from Bobb Auto for "trading in" a car that Bobb Auto already owned); *id.* at 28 (Pilatos received a series of fictitious pay advances). Such

a purpose is shared in the sense that each Defendant shared the same goal of individually benefiting, but it does not qualify as a common purpose sufficient to lend structure to an association-in-fact enterprise. *See Bible,* 799 F.3d at 655; *Guaranteed Rate, Inc. v. Barr*, 912 F. Supp. 2d 671, 687 (N.D. Ill. 2012) (holding that the plaintiff had failed to establish a RICO enterprise because it "does not present a single factual claim asserting the RICO Defendants had any interest in the outcome of the alleged scheme beyond their own individual interests," and noting that "there is no indication . . . that the RICO Defendants shared in the profits of the alleged enterprise as opposed to merely taking their own respective profits from their respective actions related to the scheme").

Plaintiffs also allege that Defendants shared the common purpose of driving down the value of Bobb Auto so that the dealership could be "bought back" at a discount, and devaluing the Chrysler brand in the local market. Am. Compl. at 3, 13. Plaintiffs do not, however, plead any factual allegations to support either of these conclusory statements. For example, as Georgion points out, the only people who could "buy *back*" Bobb Auto are the Schutzes, who sold the dealership to Plaintiffs. Georgion's Mot. Dismiss at 5. But Plaintiffs do not point to any buy-back mechanism in the sale contract, nor do they plead any facts indicating any interest, by the Schutzes or any other Defendants, in purchasing the dealership. The complaint is also devoid of allegations indicating any means for Defendants to collectively purchase the dealership, or any way that Defendants would benefit (collectively or not) from devaluing the Chrysler brand. Given the total absence of supporting factual allegations, it is implausible that Defendants collectively sought to drive down the

value of Bobb Auto or the Chrysler brand through individual actions of theft or fraud. *See Twombly*, 550 U.S. at 570; *Iqbal*, 556 U.S. at 678.

Because Plaintiffs have not plausibly pleaded that Defendants shared a common purpose, as necessary for a RICO enterprise, they have failed to state a RICO claim under §§ 1962(a)–(d).

## B.    Additional Requirements under RICO §§ 1962(a)–(d)

Defendants further contend that Plaintiffs have failed to establish other elements of each of the RICO subsections under which Plaintiffs brings claims. Although the lack of an enterprise is fatal to all of Plaintiffs' RICO claims, the Court will briefly address some of Defendants' other arguments as to Plaintiffs' claims under §§ 1962(a)–(d).

### 1.    Injury Under § 1962(c) (Count I)

In Count I, Plaintiffs allege that all Defendants violated § 1962(c) by conducting or participating in the conduct of the enterprise.  To establish a RICO claim under § 1962(c), a plaintiff must plead that a defendant: (1) conducted or participated in the conduct of (2) an enterprise (3) through a pattern of racketeering activity. *United States v. Shamah*, 624 F.3d 449, 453–54 (7th Cir. 2010).  In order for a plaintiff to have standing to bring a civil claim for violation of § 1962(c), the defendant's violation of the provision must have been a but-for cause of an injury to the plaintiff's business or property.  18 U.S.C. § 1964(c); *RWB Servs., LLC v. Hartford Comp. Grp., Inc.*, 539 F.3d 681, 687 (7th Cir. 2008).  A RICO plaintiff must plead the requisite injury for a court to have subject-matter jurisdiction over the claim.  *RWB*

*Servs.,* 539 F.3d at 686 (citing *Gagan v. Am. Cablevision,* 77 F.3d 951, 958 (7th Cir. 1996)).

Several of the Defendants—Swartz-Retson, Batusic, Newman, and Gruenhagen—contend that Plaintiffs lack standing to bring a § 1964(c) claim against them, because Plaintiffs have not pleaded that these Defendants' actions were the but-for cause of Plaintiffs' injuries. Swartz-Retson, Batusic, and Newman's ("Swartz-Retson Defs.'") Mem. Supp. at 11–12, ECF No. 46; Gruenhagen's Mot. Dismiss at 11–12, ECF No. 87. The Court agrees.

Plaintiffs' allegations as to Gruenhagen are limited to claims that he was hired by the Enterprise to defend Bobb Auto against customer lawsuits and that he received a free car in exchange for his services. Am. Compl. at 22. While Plaintiffs incurred costs in the form of attorney's fees and settlements associated with the lawsuits, Plaintiffs' allegations do not plausibly suggest that Gruenhagen's defense of Bobb Auto was the but-for cause of those costs or any other injuries that Plaintiffs suffered. *See id.* Plaintiffs do not, for example, plead that Gruenhagen engaged in deficient representation of Bobb Auto or that his representation somehow increased Plaintiffs' liability in the actions it was facing.

Nevertheless, Plaintiffs argue that they were injured because Gruenhagen's receipt of a free car in exchange for his services meant (1) that the car could not be sold for a profit to Plaintiffs; and (2) that the existence of the lawsuits could continue to be hidden from Plaintiffs, because Gruenhagen was not paid through the standard means of company check. Pls.' Resp. Opp'n Gruenhagen's Mot. Dismiss at 8–9, ECF No. 135.

Even setting aside whether Gruenhagen's receipt of a car as payment could possibly qualify as a violation of § 1962(c), it is unclear how Plaintiffs' ignorance of customer lawsuits or payment of Gruenhagen with a car rather than in monetary form harmed Plaintiffs. Plaintiffs have therefore failed to allege a "direct relation between the injury asserted and the injurious conduct alleged" as required. *See Holmes v. Sec. Inv'r Protection Corp.,* 503 U.S. 258, 268 (1992).

Plaintiffs similarly lack standing as to their claims against Swartz-Retson, Batusic, and Newman. Plaintiffs' sole allegations as to these Defendants are that Batusic and Newman, Swartz-Retson employees, prepared and transmitted materially deficient tax returns for Bobb Auto in 2014 and 2015, and formulated "fake financial statements" to "disguise[ ] . . . problematic transactions." Am. Compl. at 15, 23–28. But even if the tax returns were materially deficient and preparing and submitting them somehow qualified as participating in the conduct of an enterprise, Plaintiffs' only explanation of how the Defendants' actions are connected to Plaintiffs' injury is that, by submitting deficient tax returns, Defendants "concealed the missing funds, which resulted in Plaintiffs having to contribute funds to keep the entity solvent and running." Pls.' Resp. Opp'n Swartz-Retson Defs.' Mot. Dismiss at 6, ECF No. 74. Plaintiffs have not explained, however, how inaccurate tax returns—as opposed to, say, the many thefts that Plaintiffs allege other Defendants committed—directly resulted in Plaintiffs being forced to inject funds into the dealership. Plaintiffs therefore lack standing to bring a § 1962(c) claim against Swartz-Retson, Batusic, and Newman.

## 2.    Injury Under § 1962(a) (Count II)

In Count II, Plaintiffs allege that the Schutzes, Logothetis, and New Horizons violated § 1962(a).  To bring a claim under § 1962(a), a plaintiff must plead that a defendant: "(1) received income from a pattern of racketeering activity; (2) used or invested that income in the operation of an enterprise; and (3) caused the injury complained of by the use or investment of racketeering income in an enterprise." *Rao v. BP Prods. N. Am., Inc.*, 589 F.3d 389, 398–99 (7th Cir. 2009) (citing *Vicom, Inc., v. Harbridge Merch. Servs.*, Inc., 20 F.3d 771, 778 n.6 (7th Cir.1994)).  Plaintiffs alleging violations of § 1962(a) must plead the requisite injury for a court to have subject-matter jurisdiction over the claim.  *RWB Servs.*, 539 F.3d at 686 (citing *Gagan*, 77 F.3d at 958); 18 U.S.C. § 1964(c).

Plaintiffs allege that the Schutzes, Logothetis, and New Horizons used and invested income that was derived from racketeering activity in an enterprise, in violation of § 1962(a), when they received payments from Bobb Auto for warranties and invested the funds they received.  Am. Compl. at 34–35.  But while Plaintiffs allege generally that Defendants were enriched by such investments, they make no allegation that the *use and investment* of such funds injured Plaintiffs.  *See* Am. Compl. at 34–35.  Instead, any alleged investment appears to occur after any purported injury to Plaintiffs is complete.  Plaintiffs therefore lack standing to bring their claims under § 1962(a).  *See RWB Servs.*, 539 F.3d at 686; *In re Honey Transshipping Litig.*, 87 F. Supp. 3d 855, 866 (N.D. Ill. 2015) (dismissing a § 1962(a) claim in part because the plaintiffs failed to allege that they suffered an injury caused by the use or investment of racketeering income).

### 3. Acquiring or Maintaining Interest in an Enterprise Under § 1962(b) (Count III)

In Count III, Plaintiffs allege that the Schutzes, Logothetis, and New Horizons violated § 1962(b). To plead a § 1962(b) violation, the plaintiff must allege that: (1) the "defendants acquired or maintained an interest in an enterprise through a pattern of racketeering activity; and (2) the plaintiff suffered an injury through the defendants' acquisition or maintenance of the enterprise that is separate from the injuries that resulted from the predicate acts." *Xinos v. Kappos*, 270 F. Supp. 2d 1027, 1032 (N.D. Ill. 2003) (internal citations omitted).

According to Plaintiffs, the Schutzes, Logothetis, and New Horizons acquired and maintained an interest in the Enterprise through "fraud and as fiduciaries, with the purpose of reacquiring the dealership," and "deposited $130,000 of their money into the [E]nterprise, under the guise of a loan, to acquire and maintain control over the warranty sales," leaving Bobb indebted $130,000 to the Defendants and out almost $600,000 worth of revenue through warranty sales. Am. Compl. at 38–39. But Plaintiffs fail to allege that the Schutzes, Logothetis, and New Horizons' acquired or maintained an interest in an *enterprise*, as opposed to an interest in Bobb Auto. As Defendants point out, *see* Schutz Defs.' Mem. Supp. at 13–14, Plaintiffs' allegations support that, at most, the Schutzes, Logothetis, and New Horizons acquired and maintained an interest in *Bobb Auto* through the $130,000 loan. But according to the amended complaint, the Enterprise consists of all Defendants and has a goal of taking over Bobb Auto. Whether these Defendants acquired and

maintained an interest in Bobb Auto, then, is irrelevant to Plaintiffs' claim under § 1962(b).

### 4.      Conspiracy (Count IV)

In Count IV, Plaintiffs allege that the Schutzes, Logothetis, New Horizons, Georgion, Taylor, DeCanter, Batusic, and Swartz-Retson ("Count IV Defendants") violated § 1962(d), *id.* at 40. Specifically, Plaintiffs allege that the Schutzes, Logothetis, Georgion, and Taylor, "conspired to contractually obligate [Plaintiffs] into accepting the $130,000.00 loan as a pretext for siphoning interest from Bobb Auto and also to profit and have exclusive control over the lucrative warranty sales," Am. Compl. at 42; and that all Count IV Defendants "conspired to deprive [Plaintiffs] of income and assets through siphoning the warranty sales, manipulating inventory to maintain access to credit, theft, and falsifying financial statements and tax returns," *id.* at 42–43.

To plead a claim for a violation of § 1962(d), "a plaintiff must allege that (1) the defendant agreed to maintain an interest in or control of an enterprise or to participate in the affairs of an enterprise through a pattern of racketeering activity, and (2) the defendant further agreed that someone would commit at least two predicate acts to accomplish those goals." *DeGuelle v. Camilli*, 664 F.3d 192, 204 (7th Cir. 2011) (quoting *Slaney v. Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 600 (7th Cir. 2001)). "[T]he touchstone of liability under § 1962(d) is an agreement to participate in an endeavor which, if completed, would constitute a violation of the substantive statute." *Id.* (citing *Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 732 (7th Cir. 1998)).

Plaintiffs' failure to plead an enterprise is fatal to this claim. *See Stachon v. United Consumers Club, Inc.*, No. 98 C 7020, 1999 WL 971284, at *5 (N.D. Ill. Oct. 21, 1999), *aff'd*, 229 F.3d 673 (7th Cir. 2000) ("Because Plaintiffs establish no enterprise, they cannot demonstrate either element of a RICO conspiracy."); *Bachman v. Bear, Stearns & Co.*, 178 F.3d 930, 931 (7th Cir. 1999), *holding modified on unrelated grounds by Brouwer v. Raffensperger, Hughes & Co.,* 199 F.3d 961 (7th Cir. 2000) (affirming dismissal of §§ 1962(c) and (d) claims because plaintiffs did not adequately plead an enterprise).

What is more, even setting aside the existence of an enterprise, Plaintiffs do not plead factual allegations suggesting an agreement among the Count IV Defendants to conduct, invest in, or acquire or maintain interest in an enterprise through a pattern of racketeering activity. Plaintiffs allege that the Schutzes, Logothetis, Georgion, and Taylor, "conspired to contractually obligate [Plaintiffs] into accepting the $130,000.00 loan as a pretext for siphoning interest from Bobb Auto and also to profit and have exclusive control over the lucrative warranty sales." Am. Compl. at 42. But even if those Defendants indeed conspired to contractually obligate Plaintiffs in that way, it is unclear how conspiring to do so would violate RICO. And, even assuming, *arguendo*, that signing a contract on behalf of Bobb Auto to exchange a $130,000 loan for the near-exclusive right to sell warranties at Bobb Auto were a predicate act under RICO, Plaintiffs allege an agreement to commit only one predicate act, which is insufficient under § 1962(d). *See DeGuelle,* 664 F.3d at 204.

As for Plaintiffs' second allegation under § 1962(d), that all Count IV Defendants "conspired to deprive [Plaintiffs] of income and assets through siphoning

the warranty sales, manipulating inventory to maintain access to credit, theft, and falsifying financial statements and tax returns," Am. Compl. at 42–43, Plaintiffs have failed to plead factual allegations suggesting such an agreement by Defendants. Instead, as discussed, Plaintiffs' allegations suggest a series of acts that individually benefited each Defendant, not an agreement to collectively do so. Plaintiffs therefore have not pleaded the requisite agreement to state a claim under § 1962(d). *See DeGuelle*, 664 F.3d at 204.

In sum, Plaintiffs have failed to state a claim under §§ 1962(a)–(d) (Counts I–IV) because they have not plausibly pleaded an enterprise. They also lack standing to bring claims under § 1962(c) (Count I) as to Swartz-Retson, Batusic, Newman, and Gruenhagen, as well as all asserted claims under § 1962(a) (Count II), as Plaintiffs have not pleaded that Defendants' acts were a but-for cause of Plaintiffs' injuries. Finally, Plaintiffs have further failed to state a claim under §§ 1962(b) and (d) (Counts III and IV) because they have not pleaded that Defendants acquired and maintained an interest in an enterprise (Count III) or agreed to conduct, invest in, or acquire or maintain interest in an enterprise through a pattern of racketeering activity (Count IV). The Court accordingly grants Defendants' motions to dismiss Counts I–IV.

## II.     Remaining State Law Claims

In Count VI, Plaintiffs allege that John Schutz, Logothetis, Georgion, Queen, Taylor, DeCanter, Pilatos, and Miller committed acts of theft, conversion, and receiving stolen property, in violation of Indiana Code §§ 35-43-4-2 and 35-43-4-2.5. The Court has dismissed all federal causes of action, however, and there is no

diversity jurisdiction, contrary to Plaintiffs' assertion, *see* Am. Compl. at 8, as the parties on both sides are Illinois and Indiana citizens, *see id.* at 8–9. The Court therefore dismisses the claims in Count VI without prejudice. *See* 28 U.S.C. § 1367(c)(3). To preserve judicial resources, the Court will only consider the state-law claims in the event that Plaintiffs replead the state-law claims in conjunction with a properly pleaded federal claim.

## Conclusion

For the reasons stated herein, Defendants' motions to dismiss [43] [87] [88] [90] [92] [95] [100] are granted. Plaintiffs' amended complaint is dismissed. If Plaintiffs wish to file a second amended complaint that is consistent with this Memorandum Opinion and Order and compliant with their obligations under Fed. R. Civ. P. 11, they must do so by October 12, 2018. Failure to do so will result in a dismissal of Counts I through IV with prejudice, as well as dismissal of Count VI without prejudice. Finally, Defendant Michael Fresso is dismissed as a defendant in the case.


**IT IS SO ORDERED.**                    **ENTERED  9/14/18**

_____

**John Z. Lee**
**United States District Judge**